THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOHN BOLLA, Defendant-Appellant.

Second District   No. 81—397

Opinion filed April 28, 1983.

Karla Wright, of Bass & Wright, and Thomas J. Royce, both of Chicago, for appellant.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Barbara A. Preiner, Assistant State's Attorney, and Phyllis J. Perko and Cynthia N. Schneider, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

In a jury trial, John Bolla was convicted of aggravated kidnaping for ransom (Ill. Rev. Stat. 1981, ch. 38, par. 10—2(a)(1)) and conspiracy to commit theft by threat (Ill. Rev. Stat. 1981, ch. 38, par. 8—2(a)). He was sentenced to concurrent prison terms of eight years for the aggravated kidnaping and two years for the conspiracy. He appeals, contending that although his involvement could evidence his participation in the conspiracy to commit theft by threat he could not be charged with responsibility for the kidnaping; and, alternatively, he was deprived of a fair trial.

On Thursday, May 29, 1980, Edward Kvavli, a wealthy restauranteur and tavern owner, was abducted from the parking lot of a tavern he owned in Keeneyville, Illinois, and held for $600,000 ransom. The next day, Kvavli's captors freed him on the understanding that Kvavli would pay them $600,000 or that they would kill him, his sister, and his nephew.

After his release, Kvavli agreed to cooperate with the Illinois Department of Law Enforcement (DLE). Over the weekend Kvavli received numerous phone calls demanding money and threatening his life and those of family members if he did not comply with the demands for money. Eventually, a payoff was arranged for 9:30 p.m. on June 3, 1980, at a designated point on Prince Crossing Road. On that evening John Bolla, along with Trenton Nelson, Don Fotre, and Charles Arnhold, was arrested at or near the place where Kvavli had agreed to make the payoff. A fifth defendant, Leo Bonvini, was later indicted.

The DLE agents at the "drop" point saw the defendant standing at the tracks on the shoulder on the east side of the road, saw a black over blue Mercury drive past several times, at one point stopping between 20 to 30 feet from Bolla and Nelson, and heard one of the occupants of the car shout "It's almost time, the heat's on, stay cool." The car was established to have been in the possession of defendant Arnhold and was found later that evening in the driveway of the Nelson home. When the suitcase was dropped approximately 30 feet from Nelson and Bolla, Nelson picked it up, and after the agents ordered the men to halt defendant Bolla fled on his motorcycle.

Defendant first contends that his presence at the designated "drop" for the ransom was after Kvavli had been released and the kidnaping had therefore ended; and that no evidence connected him with the substantive offense of aggravated kidnaping beyond a reasonable doubt.

■ The crime of "kidnaping" occurs when one is secretly confined against his will or by force, threat of imminent force or deceit carried from one place to another with intent secretly to confine him against his will. (Ill. Rev. Stat. 1981, ch. 38, par. 10—1.) The offense of "aggravated kidnaping" includes the definition of kidnaping from section 10—1 of the Criminal Code of 1961 and adds, as here material, that the kidnaping is for the purpose of obtaining ransom from the person kidnaped or from any other person. (Ill. Rev. Stat. 1981, ch. 38, par. 10—2(a)(1).) In a prosecution for kidnaping carried out by several defendants pursuant to a common design, a defendant need not be actually present at the kidnaping if he is otherwise a party to the crime. (*People v. Touhy* (1935), 361 Ill. 332, 354-55.) An accused is guilty of the crime if he participates in any of the elements which comprise the offense; thus collecting ransom may be sufficient evidence upon which to sustain a conviction of kidnaping for ransom. (*People v. Petitti* (1929), 337 Ill. 625, 633.) The fact that a victim may have been released and is free of detention before money is paid is immaterial where the offense has already been committed and is complete. *Tyler v. State* (Tex. Crim. App. 1956), 288 S.W.2d 517, 520.

Arguing that the kidnaping ended when Kvavli was released, defendant relies on *People v. Mulcahey* (1978), 72 Ill. 2d 282, 286, and *People v. Behm* (1973), 45 Mich. App. 614, 622, 207 N.W.2d 200, 205, *rev'd on other grounds* (1974), 52 Mich. App. 119, 216 N.W.2d 631. In *Mulcahey*, the supreme court concluded that the kidnaper's attempt to forcibly secure money from the victim's husband amounted to attempted armed robbery when the kidnaper knew that the victim had been released and the husband had no incentive to pay the ransom. In

*Behm,* the court concluded that a kidnaping continued until the victim was released from confinement so as to convict the defendant of the charge although he was not present at the forcible abduction of the victim. Neither case is helpful to defendant in the circumstances of this case.

The State has urged that regardless of when the kidnaping ended, there was in fact one agreement or conspiracy to commit two crimes and that Bolla as a member of the conspiracy is guilty of kidnaping if he was a knowing participant in any part of the scheme. The defendant responds that he cannot be convicted of kidnaping based on a conspiracy to commit kidnaping which was not set forth in the indictment.

There is no proof beyond a reasonable doubt that Bolla was present at the abduction of Kvavli or during his confinement. Kvavli, who was blindfolded during his captivity, was unable to identify Bolla or his voice at the trial. This is not to say, however, that defendant was not proven beyond a reasonable doubt to be an accomplice as distinguished from a conspirator.

We reject the State's argument that proof of conspiracy between Bolla and his codefendants is itself the legal basis of Bolla's accountability for their criminal conduct as a matter of law. (Ill. Ann. Stat., ch. 38, par. 5—2, Committee Comments, at 288 (Smith-Hurd 1972); W. LaFave & A. Scott, Criminal Law sec. 65, at 513 (1972); Note, *Developments in the Law—Criminal Conspiracy,* 72 Harv. L. Rev. 920, 998-99 (1959).) This is not to say that the acts of conspiracy may not satisfy the requirements of subsection (c). (Ill. Ann. Stat. ch. 38, par. 5—2, Committee Comments, at 288 (Smith-Hurd 1972); Model Penal Code sec. 2.04(3), Comment, at 22-23 (Tent. Draft No. 1, 1953); see, *e.g., Nye & Nissen v. United States* (1949), 336 U.S. 613, 618-20, 93 L. Ed. 919, 925-26, 69 S. Ct. 766, 769-70.) Under subsection 5—2(c), Bolla could be proved guilty of aggravated kidnaping as an accomplice by proof that his conduct subsequent to the kidnaping and to the release raised a fair inference that he aided, agreed or attempted to aid others in the planning or commission of the offense. Ill. Rev. Stat. 1981, ch. 38, par. 5—2(c).

That count I in the indictment did not set forth legal accountability as the basis for charging Bolla with aggravated kidnaping as principal did not render the indictment defective (*People v. Heuton* (1971), 2 Ill. App. 3d 427, 428); to the contrary, the State could show that the crime resulted from a conspiracy and the steps by which the conspirators effected the crime, including every act of each conspirator in furtherance of the common purpose, without charging them

with conspiracy. (*People v. Hedge* (1918), 284 Ill. 513, 516-17.) Bolla's challenge to the indictment, therefore, is without merit.

There is evidence that on the day following his release, Kvavli, while driving, detected that he was being followed by a man wearing metal frame sunglasses and driving a black car with stripes on the front fender. A pair of metal frame glasses was recovered near railroad tracks which Bolla passed as he fled from the "drop" point before he was apprehended. A black Pontiac Trans-Am with a gold hood emblem is registered in the name of the defendant's wife. A West Chicago police officer saw Bolla driving a black Pontiac Trans-Am with red markings and a gold hood emblem, and saw it parked in front of his in-laws' house. At the "drop" point DLE agents overheard the two occupants of a black-over-blue 1968 Mercury sedan, inferentially Arnhold and Fotre, inform Bolla and Nelson that the money was on the way. Agents recovered a pair of white-and-maroon leather-like gloves similar to codefendant Nelson's gloves near the roadside where Bolla was apprehended. Agents discovered a third pair of gloves in the 1968 Mercury sedan which was in codefendant Arnhold's possession prior to June 3, the payoff date. DLE agents searching in the vicinity of the spot where Bolla was apprehended recovered a Winchester model 94 30/30 rifle; Bolla was seen with a rifle as he tried to flee from the "drop" point.

While Bolla presented evidence which sought to contradict the circumstantial evidence connecting him with codefendants Arnhold and Fotre whose participation in the kidnaping was more firmly established, it was in no way conclusive nor required to be believed by the jury. His explanation that he received the white-and-maroon gloves from someone he knew only as "Tom," who made a practice of giving away the gloves in the tavern which both frequented, is one example. His presentation of evidence controverting the red markings on his Pontiac Trans-Am is another. His explanation that on June 3 after leaving work for the day at 11:30 he stopped at two bars and drank between 15 to 20 beers, before going to the "drop" point after a stranger offered $200 if he would pick up a briefcase which Bolla suspected contained "pot or something," his arrival on a motorcycle which an alleged stranger furnished, his fleeing when unidentified persons began shooting at him (contrary to the testimony of DLE agents who said that Bolla fled when they approached and identified themselves), and his denials that he had a rifle that night, all were subject to the jury's findings as to credibility.

The jury may draw inferences from the conduct of the defendant which show participation in a common purpose to do an un-

lawful act. (*People v. Tate* (1976), 63 Ill. 2d 105, 109.) The determination of the jury is not to be set aside unless it is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. (*People v. Tate* (1976), 63 Ill. 2d 105, 108.) Where, as here, the evidence discloses the defendant's close affiliation with the actual perpetrators of the kidnaping, other circumstances pointing to a common criminal design of the group, Bolla's flight from the "drop" point, and his failure to advance a reasonable hypothesis of innocence, the jury is permitted to draw the inference that Bolla aided, agreed or attempted to aid in the planning or commission of the kidnaping. Thus, the defendant is properly convicted of the crime without proof that he actually assisted in every element of its commission. *People v. Crutcher* (1979), 72 Ill. App. 3d 239, 243; *People v. Fuller* (1980), 91 Ill. App. 3d 922, 929; *People v. Grice* (1980), 87 Ill. App. 3d 718, 725.

Defendant has urged that he cannot be convicted of both kidnaping for ransom and conspiracy to commit theft by threat, that the conspiracy "merged" into the completed offense of kidnaping. The State rejoins that there was "a single agreement in which the commission of at least two crimes was contemplated," that the conspiracy conviction must stand as to the crime of theft by threat.

The crime of conspiracy is separate and distinct from crimes committed pursuant to it. (*People v. Robertson* (1918), 284 Ill. 620, 623.) The Criminal Code of 1961 did not change this long-standing rule but only modified it to the extent that "[n]o person shall be convicted of both the inchoate and the principal offense." (Ill. Rev. Stat. 1981, ch. 38, par. 8—5; see also *People v. Brouilette* (1968), 92 Ill. App. 2d 168, 173.) Defendant correctly argues that he could not be convicted of and sentenced on both conspiracy to commit kidnaping and kidnaping. (*People v. Walker* (1981), 84 Ill. 2d 512, 526.) The difficulty with defendant's argument and his supporting cases is that the conspiracy was not based solely on the kidnaping, which was complete; but the conspiracy came to embrace the additional objective of theft by threat after Kvavli's release.

A single conspiracy exists even though it embraces multiple crimes if the crimes are the object of the same agreement *or* continuous conspiratorial relationship. (Model Penal Code sec. 5.03(3) (Tent. Draft No. 10, 1960); W. LaFave & A. Scott, Criminal Law sec. 62, at 470-71 (1972).) Beginning with a six-page note containing kidnaping plans and written in Bonvini's hand, there was evidence of a conspiracy to commit kidnaping for ransom. That conspiracy did not end but continued when Kvavli was released on the extorted promise that he

would pay the kidnapers $600,000. (*People v. Touhy* (1935), 361 Ill. 332, 348.) Over the weekend, Kvavli was subjected to numerous phone calls threatening not only his life, as alleged, but also threatening the lives of his sister and nephew. The overt act charged in support of this conspiracy was not part of the kidnaping but involved the pickup of money four days after Kvavli's release to end new threats of harm.

■ It was incumbent on defendant to establish that the conspiracy was in preparation for the same substantive offense as that for which he was convicted separately in count I. (Accord, *State v. Epstein* (1980), 175 N.J. Super. 93, 98, 417 A.2d 1055, 1058.) Otherwise, separate convictions for conspiracy and a crime committed pursuant to that conspiracy may stand if the proof shows that the object of the conspiracy was the commission of additional offenses. (Model Penal Code sec. 1.08(1)(b), Comment, at 32 (Tent. Draft No. 5, 1956).) The fact that Bolla was an accomplice to the kidnaping for ransom based on conspiracy does not mean that he conspired to commit kidnaping only. A conspiracy conviction in addition to conviction for a substantive crime is proper where, as here, the conspiracy has as its objective engaging in a continuing course of criminal conduct; this involves a distinct danger in addition to that which follows from the actual commission of the substantive offense. Model Penal Code sec. 1.08(1)(b), Comment, at 32 (Tent. Draft No. 5, 1956); W. LaFave & A. Scott, Criminal Law sec. 62, at 494-95 (1972).

■ We conclude that the evidence in this view sustains the State's theory that there existed a single conspiracy to engage in a continuing course of criminal conduct to extort money, first by kidnaping Kvavli for $600,000 ransom, then by telephoned threats against not only Kvavli, but against other family members. Moreover, consistent with *People v. King* (1977), 66 Ill. 2d 551, 566, under the conspiracy count the act which supported an offense in addition to kidnaping was the agreement to commit theft by threat with the requisite intent; whereas, as to Bolla, the act which supported his liability for kidnaping was his agreeing to aid in the commission of the kidnaping. Thus two offenses were carved from different physical acts. Nor was the conspiracy a lesser included offense of the kidnaping (*People v. Robertson* (1918), 284 Ill. 620, 623), but each was a distinct crime with different proof. *Cf. People v. Mulcahey* (1978), 72 Ill. 2d 282, 286 (defendant properly convicted of both aggravated kidnaping (ransom) and attempted armed robbery where first he kidnaped wife, then aimed gun at husband after learning at drop site that wife had escaped).

In this view the conspiracy to commit theft by threat was not in preparation for the consummated kidnaping and has not been eliminated or "merged" by the Criminal Code of 1961; the judgment of conviction on count II is therefore affirmed.

We further conclude that the defendant received a fair trial and is not entitled to a new trial. Defendant claims that the court erred in permitting the substitution of a juror after the jury had been sworn and impaneled, in sequestering the jury and having installed a walk-through metal detector in the courtroom for security. The defendant has argued that the combination of these rulings created an extraordinary atmosphere of terror that denied him a fair trial. We are not so persuaded.

After the jury was impaneled, a juror, Mrs. McGhee, told the court *in camera* that it worried her that Bolla knew where she worked, that she thought her son may have had problems with Bolla's father, and admitted that she told other jurors that she believed one of the defendants recognized her. The judge denied a motion to excuse her for cause, which the State did not oppose, based on the judge's conclusion that she had disclosed only a "search of conscience." Three days later the State informed the court that a car belonging to Mrs. McGhee's son had been "shot up" the previous day. Following a second *in camera* interview, the court excused Mrs. McGhee and replaced her with an alternate juror after she told the court that she could no longer serve. Bolla argues that because two jurors saw Mrs. McGhee arrive that morning, the jury could only conclude that she was excused not for illness but for fear of her own safety. He further argues that the court's sudden sequestration of the jury *sua sponte* further fortified the jury's conclusion that Bolla was connected with McGhee's disappearance.

██ The burden of showing that a juror has a disqualifying state of mind is on the party challenging the juror. (*People v. Cole* (1973), 54 Ill. 2d 401, 413.) The qualification of the juror is a factual determination which the trial court must make on the evidence, and the mere suspicion of bias or partiality is not evidence which is sufficient for a finding of disqualification. (*People v. Hyche* (1979), 77 Ill. 2d 229, 240.) The jury could not know that Mrs. McGhee's son had his car vandalized and any casual nexus between the *voir dire* by Bolla's counsel and the fact that two jurors saw Mrs. McGhee arrive on the morning that she was excused but not take her place in the jury box appears speculative. The trial judge was in a better position to assess the likelihood of any such jury prejudice than are we. *People v. Bolton* (1976), 35 Ill. App. 3d 965, 975.

The trial court's decision to thereupon sequester the jury also appears to be a proper exercise of discretion (Ill. Rev. Stat. 1981, ch. 38, par. 115—4(m)) based on possible threats which third persons might communicate to the jury following the vandalism involving Mrs. McGhee's son. (See *People v. Saltz* (1979), 75 Ill. App. 3d 477, 479.) If not sequestered, the jury could well have learned of the vandalism and be tainted thereby since the incident was later reported in a local newspaper. His decision to sequester the jury over the more drastic remedy of declaring a mistrial was proper.

Defendant also asserts that prejudicial error occurred when Kvavli testified with some emotion that he had not been home in 10 months, but lived out of a suitcase, running for his life; also on cross-examination when defense counsel elicited from Kvavli's sister, Elaine Williams, that on a prior occasion after the kidnaping she had threatened to arrange retaliation against members of the Bonvini family in the event that any harm befell her or her brother; and when a DLE agent testified over objection that Arnhold, under custodial interrogation, said that he would not talk but would rather be alive in jail then dead outside.

A genuine emotional outburst by a witness giving vent to natural feeling does not compel a mistrial (*People v. Hudson* (1970), 46 Ill. 2d 177, 197), but the decision to grant is within the trial court's discretion (*People v. Bradley* (1976), 43 Ill. App. 3d 463, 468). Moreover, the objection to the volunteered comments by Kvavli was properly sustained and, therefore, removed from the jury's consideration. (*People v. Burnett* (1979), 74 Ill. App. 3d 990, 1001; *People v. Reed* (1982), 108 Ill. App. 3d 984, 993.) Nor did the testimony of Elaine Williams require a mistrial where her threats to Bonvini were drawn out in cross-examination, and no motion was made to strike the testimony now claimed to be inflammatory. Prejudicial statements which a defendant invites by cross-examination do not result in reversible error. *People v. Thigpen* (1966), 33 Ill. 2d 595, 598; *People v. Brown* (1969), 116 Ill. App. 2d 228, 231.

Defendant correctly asserts that codefendant Arnhold's statement, that he would rather be alive in prison than dead outside, as related by a DLE agent, was not within the scope of the coconspirator's admission exception to the hearsay rule when it was made to the police following arrest rather than in furtherance of the conspiracy. (*People v. Cart* (1981), 102 Ill. App. 3d 173, 182.) The statement, however, was too vague to be prejudicial as it did not directly refer to other coconspirators or implicate anyone in any crime.

Defendant's further objections that installation of the walk-

through metal detector and the fact that plain-clothes agents accompanied Kvavli and his sister when they entered the courtroom, though timely, are similarly without merit. Reasonable safety measures may be taken by a trial judge to insure orderly proceedings but are justified upon a showing, here made, of danger to order or safety. (*People v. Collins* (1980), 85 Ill. App. 3d 1056, 1059.) Kvavli had been repeatedly threatened by his kidnapers during and after his captivity; his sister had threatened codefendant Bonvini; counsel for Arnhold reported at one point that he had privileged information concerning potential danger to Kvavli; and a car belonging to a juror's son was "shot up." The need for security thus had a basis in fact, and installation of the safety device was not in derogation of defendant's presumption of innocence where all persons entering the courtroom were routinely subjected to search. See *People v. Steel* (1972), 52 Ill. 2d 442, 454.

Defendant also contends that the State's statements in closing argument to fight terror with law were inflammatory. Defendant offered no objection to this twice-made exhortation. The prosecutor may properly comment unfavorably on defendant and the violence of the crime, when supported as here by the evidence, and speak of the evil results of crime and the benefits of fearless administration of the law. (*People v. Jackson* (1981), 84 Ill. 2d 350, 360; *People v. Benedik* (1974), 56 Ill. 2d 306, 311.) Under this view, no error occurred.

Finally, Bolla contends that he was entitled to a severance and mistrial when the State failed to timely produce tape recorded evidence which he asserts was highly exculpatory as to him. Charles Rogers, a tenant of Bonvini, told the State in an interview conducted Thursday evening, February 26, 1981, that after the kidnaping he tape-recorded one of two conversations in which Bonvini implicated himself but said he did not know that Bolla or Nelson were involved. Rogers played the tape for prosecutors who requested the tape, though this was denied by Rogers' attorney, who said he burned the tape later that evening.

Four days later the State filed an addendum to discovery disclosing the contends of the Rogers' tape. Rogers did not appear as the court requested on March 3 and a subpoena issued. The court ordered that when Rogers was served, all counsel would have the opportunity to interview him together.

Rogers was eventually served and appeared the following Monday, March 9. He was made available to all defense counsel, but not before the State had interviewed him out of the presence of defense counsel during a lunch recess on Friday, March 6. When he appeared on

March 9, he could not recall any conversation with Bonvini. The trial court, without conducting a formal evidentiary hearing, ruled that the State disclosed evidence of the tape within a reasonable time. Rogers never testified.

After the trial concluded, Rogers came forward with a second copy of the tape which he turned over to DLE agents. The court thereafter impounded the addendum, the tape, and a transcript of the tape, none of which is included in the record on appeal.

Defendant contends that this tape was highly exculpatory and that the State failed to timely notify defendant of the existence of the tape, and also denied defendant access to Rogers who was vital to defendant's trial defense.

Under Supreme Court Rule 415(b) (87 Ill. 2d R. 415(b)), the State has a continuing duty to disclose material or information subject to disclosure which it discovers, and must "promptly notify" the other party and the court, if the material or information is discovered during trial. The State has the burden of showing that it promptly disclosed the information and that it used due diligence. (*People v. Williams* (1981), 96 Ill. App. 3d 250, 252-53; *cf. People v. Stamps* (1977), 52 Ill. App. 3d 320, 325 (State must show good faith when it loses information in its custody which defense was entitled to obtain).) The defendant has not shown how a more prompt disclosure of the existence of the tape would have assisted Bolla in preparing his defense (see *People v. Foster* (1979), 76 Ill. 2d 365, 384), when Rogers· was equally unavailable to both the State and the defense.

Regardless of when the State disclosed existence of the tape, the State in this case did not withhold or suppress evidence when neither it nor its agents were in possession of the tape recording. *People v. Spurlark* (1979), 74 Ill. App. 3d 43, 57; *People v. Molsby* (1978), 66 Ill. App. 3d 647, 656; *People v. Berry* (1977), 54 Ill. App. 3d 647, 652.

Defendant further charges by implication that Rogers' lapse of memory resulted from a prosecutorial plot hatched over the Friday lunch recess. This bare statement, without more, was not sufficient to show the State's noncompliance with Rule 415. (See *People v. Peter* (1973), 55 Ill. 2d 443, 450-51.) On the contrary, the court instructed Rogers that he was free to answer in private questions from counsel for the defendants.

Bolla's final assertion is that he was entitled to severance and mistrial in view of the exculpatory tape recording. It is unclear how exculpatory the tape is. The fact that Bonvini said that he did not know of Bolla's involvement is subject to conflicting inferences in view of the rule that it is possible for various persons to be parties to

a single conspiracy even though they do not know the identity of each other. (See W. LaFave & A. Scott, Criminal Law sec. 61, at 461 (1972).) It is also doubtful whether the tape recording was any more exculpatory when the jury heard other testimony that Bonvini did not know other defendants personally. It does not appear that the missing evidence was such as to create a new reasonable doubt of guilt that did not otherwise exist. See *United States v. Agurs* (1976), 427 U.S. 97, 114, 49 L. Ed. 2d 342, 355, 96 S. Ct. 2392, 2402; *People v. Hardy* (1979), 70 Ill. App. 3d 351, 355-56.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

LINDBERG and NASH, JJ., concur.