THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DIANE ALLEN, Defendant-Appellant.

First District (5th Division)   Nos. 82—848, 82—1258 cons.

Opinion filed July 22, 1983.—Rehearing denied September 1, 1983.

James J. Doherty, Public Defender, of Chicago (Fred S. Flores and Karen A. Popek, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Bruce A. Cardello, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

After a jury trial, defendant was convicted of attempted armed robbery and conspiracy but acquitted of murder. The trial court ruled that the conspiracy conviction merged into the attempt conviction and sentenced defendant to a term of eight years for attempted armed robbery. On appeal, she contends that (1) she was denied a fair trial when the trial court gave an erroneous instruction on an essential element of attempted armed robbery; (2) she was not proved guilty beyond a reasonable doubt; and (3) the trial court erred in finding that she knowingly and intelligently waived her right to remain silent in denying her pretrial motion to suppress statements.

At a hearing on the motion to suppress, Officer Malec testified that he and his partner were patrolling on the evening of September 26, 1980, when they heard gunshots and proceeded to an apartment building at 1028 North Dearborn where Phillip DiMaso flagged them down and said a man had been shot inside. DiMaso had seen a man and woman emerge from the building and proceed south on Dearborn. When defendant was stopped as she walked south on Dearborn, she denied knowing anything about the incident. He (Malec) took her

back to the scene and DiMaso identified her as the woman he had seen leaving the building, but defendant again denied any knowledge of what had occurred. He then informed defendant of her rights and placed her in a squad car, but no further questioning took place and defendant made no more statements.

Assistant State's Attorney Patrick O'Brien testified that he spoke to defendant at 7 p.m. on September 28, 1980. He read the *Miranda* rights to her and, after acknowledging understanding of them, she agreed to be interviewed and was questioned for 25 to 30 minutes. During a second 10-minute interview a short time later, defendant was again informed of her rights and agreed to give a written statement which was taken down, transcribed, and typed by a court reporter. Defendant then looked at and initialed each page, made some corrections, and signed the last page. She did not request a lawyer during any of these interviews, no promises were made to her, and there was no misrepresentation of any evidence. Defendant was not subjected to physical abuse and had been allowed to eat and to see members of her family. She did not look tired nor say that she was tired during these interviews. O'Brien acknowledged that defendant had been in custody approximately 48 hours when the written statement was obtained, and that he never asked her if she could read or how much education she had. He denied telling defendant that she would be better off telling the truth or that she was just a witness but admitted that he did not inform her before taking the statement that she might be charged with murder. She was under arrest at the time of questioning.

Investigator Mahon testified that he questioned defendant at about midnight on September 26 after he informed her of her rights and she acknowledged understanding them. She denied any knowledge of the homicide, and questioning ceased while several potential witnesses were questioned. An hour or two later, he again questioned defendant after informing her of her rights, and she repeated her denial. Each of these interviews lasted a few minutes. A short time later, Detective Porter spoke to defendant and reported to him (Mahon) that she had provided some information. During this time, she was in an 8- by 10-foot interrogation room which contained tables and chairs and had *Miranda* warnings posted on the walls. She was not handcuffed or chained to the wall but had been informed from the time of the first interview that she was under arrest in connection with a homicide. Defendant was placed in the lockup after these interviews and remained there until 6 p.m. the following evening when he interviewed her for 15 to 20 minutes after once more reading

*Miranda* warnings to her, which she again acknowledged understanding. She agreed to answer questions and provided substantially the same information that she had given Porter during a previous interrogation. Shortly after this interview, her mother and stepfather arrived, and he (Mahon), speaking to them outside defendant's presence, informed them that defendant might be involved in a murder. Defendant's mother spoke to her privately and then told him that defendant wished to tell the truth about the incident. He spoke to defendant again in the presence of her mother and stepfather and, because the information provided in this interview differed from that given earlier, he began looking for Gregory Mitchell, who was arrested in connection with the homicide sometime before 5 p.m. on September 28. He (Mahon) was present during each interview that O'Brien had with defendant and corroborated O'Brien's testimony. Defendant's mother was at the station frequently and brought food to defendant. Neither defendant nor her mother requested an attorney, and no promises were made to either of them, nor were there any misrepresentations of the evidence that the police had. Mahon acknowledged that the written statement was taken approximately 48 hours after the investigation began, and that it was his decision to keep defendant beyond two court calls, explaining that she had not yet been charged in the crime and further investigation was warranted. He denied that either defendant or her mother was told that defendant was only a witness in the case and would be released if she detailed her involvement in the incident. However, he did tell her mother why defendant was being held and stated that it would be better for her if she told the truth. Defendant did not ask to speak to a lawyer, nor did she ask to see her mother. He did not recall asking defendant how much schooling she had, but he did ask her if she could read and was satisfied that she understood her rights.

Detective Mannion testified that he participated in the first two interviews wherein defendant denied having any knowledge regarding the incident, and corroborated Mahon's testimony with regard to the warnings given defendant. Defendant never asked for an attorney or to see her mother and gave no indication that she did not want to answer questions. There were no misrepresentations or promises made in exchange for her cooperation. Defendant did not appear tired during the interviews.

Detective Porter testified that he spoke to defendant alone sometime between 1 and 4 a.m. on September 27 at the request of Mahon and Mannion. He informed her of her rights, and she agreed to answer questions after stating that she understood those rights. In the

course of this interview, defendant admitted her involvement in the occurrence and provided some information. He spoke to her for approximately one hour, during which she did not ask to see her mother or consult with an attorney. No promises were made to defendant nor was any evidence misrepresented to her.

Johnnie Mae Allen, defendant's mother, testified that when she spoke to Mahon at approximately 6 p.m. on September 27, he assured her that if defendant told the truth she could go home. She told this to defendant and urged her to tell the truth. At that time, defendant appeared tired and sleepy and stated that she was cold and hungry. She went out to get food for her and returned at approximately 9:30 and remained at the station until 3 a.m. During that time, she was allowed to be with defendant whenever she wished. Mahon spoke to her again between 5 and 6 p.m. the next day and urged her to get defendant to tell the truth so she could go home. She then spoke to defendant and once more begged her to tell the truth. Defendant had attended a special school for slow learners and had completed only eighth grade.

Defendant testified that she was taken into custody, handcuffed, and transported to a police station at approximately 9:30 p.m. on September 26, 1980. At midnight she was taken to another station where police questioned her continuously, did not give her anything to eat or drink, and denied her repeated requests to speak to her mother, stating that no phone call would be allowed until she told the truth. She was not allowed to sleep all night because officers kept waking her up to ask questions. She saw her mother during the evenings of September 27 and 28 and was informed that the police promised to let her go if she told the truth. Two officers also told her she was just a witness. She was placed in the lockup during the day but was never given food and was not able to sleep. Defendant denied that the police informed her of her rights during interviews prior to the taking of her written statement, and insisted that she had asked to speak to her mother and told officers that she did not want to answer questions. She further denied making any admissions to Detective Porter, maintaining that she told the police nothing of her involvement in the incident until after her mother told her of the promises made. She did not tell the police that the two men involved were named Cookbey and Joe, but did give them the names of James Holmes and Charles Mitchell after speaking to her mother.

Porter testified in rebuttal that when interrogated during the early morning hours of September 27, defendant did admit her involvement in the homicide and gave him the names of Cookbey and

Joe when asked to identify the other participants. Mahon also testified that defendant repeated this information to him during the early evening of the 27th before speaking to her mother. He again denied that defendant was ever told she was merely a witness.

The trial court found that defendant's initial statements to the arresting officer denying knowledge of the incident were made while in custody but before she was informed of her rights and ordered that they be suppressed. It further found, based on the totality of the circumstances, that all other statements made by defendant were voluntarily made after she knowingly waived her rights, and denied her motion to suppress as to them.

At trial, Daniel Sapp testified that he lived in the rear garden apartment at 1028 North Dearborn. At 9 p.m. on September 26, 1980, he was at home playing cards with four other men when the doorbell rang and he pressed the buzzer to open the outer door for his caller. When he opened the apartment door, defendant stepped in and asked if William Duncan had arrived yet. When informed that Duncan was expected but had not arrived, defendant stayed five minutes and left, stating that she would return later. Approximately one hour later, defendant returned and was again admitted through the front entrance, but left immediately after being informed that Duncan still had not arrived. The doorbell rang moments later, and he pressed the buzzer to let Duncan enter. Within two minutes, he (Sapp) heard four or five shots. He stayed in his apartment until police and the building manager, Phillip DiMaso, knocked on the door and asked him to step into the hallway where he saw Duncan sprawled on the floor between the two front doors. Defendant had been to a game with Duncan two days before the shooting, and he noticed nothing unusual about her on the two occasions she came to the apartment on the night in question.

Phillip DiMaso testified that he owns and manages the apartment building where the shooting occurred. It is a four-story, eight-unit building with a single front entrance consisting of a foyer and two doors. The outer door is not locked, but the inner door has an automatic lock which is activated by pressing a buzzer from inside the apartments. Immediately inside the front entrance is a stairway to the upper floors. There are also rear entrances on each of the four floors. He had just arrived with a friend on the night in question and was parking his van in a lot immediately south of the apartment building when he heard three or four shots. He jumped out of his car and ran toward the front of the building where he saw a black man throw something under a vehicle parked in front of the building. A second black man and defendant, whom he had seen in the building

on prior occasions, were walking south on Dearborn. The man turned and ran west through the parking lot, but defendant continued walking down Dearborn. He (DiMaso) then stopped a squad car and pointed out defendant and the object thrown under the car to the offices. He later learned the object was a gun.

Officer Brogi testified that he was in a squad car with his partner, Officer Malec, when he heard gunshots and then saw DiMaso and another man signaling for them to stop. DiMaso told them he saw a black man and woman leaving the scene and pointed to defendant who was walking south on Dearborn. They brought her back to the apartment building where they saw Duncan lying in the doorway. Brogi acknowledged that defendant did not run when pursued and was not armed. DiMaso told them a man ran through the parking lot, but he (Brogi) did not see him nor hear a car leaving the alley.

Edward Pappano testified that he lived on the third floor of the apartment building with his fiancee and, on the night of the shooting, he saw his mother and DiMaso in the parking lot and went down to speak to them. As they stood in the lot, he noticed a car circle the lot twice as if looking for a parking space before entering the alley behind 1030 North Dearborn and stopping. Defendant and two men got out of the car, and defendant walked through the parking lot toward the front of the building while the two men, one of whom was carrying a satchel, entered the back yard of the apartment building and approached the rear entrance. They tried the entrance on the first floor but could not open the door. They then went up to the second floor and entered the building. Normally that door is kept locked, but the lock was broken on the night in question. Five to 10 minutes later, he (Pappano) heard two or three shots and saw one of the men run out of the front door of the building and throw something under a car, then run north on Dearborn. He (Pappano) walked to the front of the building and saw defendant come down the front steps and start south on Dearborn. The second man ran out of the building and through the parking lot toward the alley. He (Pappano) ran after him and saw him get into the car with three other people; the car then pulled away. He returned to the front of the building and saw Duncan and the satchel which one of the men had carried.

Detective Porter testified that he questioned defendant for approximately one hour between 1 and 4 a.m. on September 27, 1980. He first introduced himself and advised defendant of her rights. She indicated she understood them and agreed to answer questions. When he told her that the police had some information and had spoken to certain witnesses, defendant admitted that she had been dating Dun-

can for several months and once visited him at one of the card games. She and two men named Cookbey and Joe were going to rob the game that night. She was to go in, make sure the game was going on, and get them to open the door. She, Cookbey, Joe and a third man went to the building and parked in the alley. She went to the apartment twice and asked for Duncan. The second time she entered the building Cookbey and Joe gained entrance through a rear door and were waiting in the hallway. After the second visit, she heard the buzzer which opens the front door and saw Duncan enter the building. When Duncan saw the gun in Cookbey's hand, he started to struggle with him and was shot. She, Cookbey and Joe than ran out of the front door. Joe went north on Dearborn, she walked south, and Cookbey ran off by himself. Porter acknowledged that the report of this interview indicates that Cookbey approached defendant with the proposal to rob the card game; that Duncan used to give defendant money; and that Cookbey told her to follow him to the car, but she continued south on Dearborn.

Patrick O'Brien, a former assistant State's Attorney, testified that he interviewed defendant three times on September 28, 1980. Each time she was informed of her rights, acknowledged understanding them, and agreed to answer questions. A court reporter was present with defendant's permission and made a record of the third conversation. After a transcription was typed, defendant read it, initialed each page, corrected errors, and signed the statement. She admitted therein that she met with Charles Gregory Mitchell and James Holmes at 7:30 p.m. on September 26, 1980. They discussed robbing the card game, how they would gain entrance to the apartment, and how they would escape. She had been to a game two nights before with Duncan, and when she returned that night Sapp let her in. She asked if Duncan was there and then left. Mitchell and Holmes had entered the building with her and they met outside and walked back to her cousin's apartment. Mitchell and Holmes left for a short time, then returned with a third man and a car. The four of them left in the car and, on the way, discussed their plan. They decided to park in the alley so they could leave by the rear entrance, and also talked about the guns they planned to carry in a gym bag. When they arrived at the apartment, Mitchell and Holmes went to the rear entrance while the third man waited in the car. She walked through the parking lot to the front of the building and was again admitted to the apartment. Duncan still had not arrived, so she left. As she, Mitchell and Holmes started toward the front of the building, Mitchell had a gun in his hand. At that moment Duncan entered the building and Mitchell

pointed the gun at him, ordering him into the hallway. Holmes left the building, and Duncan began struggling with Mitchell. As she left the hallway, she heard three shots. She did not expect Duncan to be there that night and had used his name merely to gain entrance, make sure the game was in progress, and find out how many players were present. While in custody, she was given food and allowed to speak to her mother, who told her the only way to help herself was to tell the truth. O'Brien further testified that defendant's prior oral statements were substantially the same as her written statement.

Officer Thomas Kaminsky testified that he recovered physical evidence from the scene. Duncan's coat pockets had not been turned inside out, and he did not notice whether his pants pockets had been disturbed.

Investigator Mahon testified that he questioned defendant twice during the early morning hours after the homicide, and she denied having any knowledge of the incident. At approximately 6 p.m. the next evening, defendant admitted to him that she had discussed robbing the card game with a man named James Cookbey or James Holmes. Defendant then related that she, Cookbey, and two men named Joe and Slim went to the apartment, and described substantially the same events as were contained in her written statement except that she stated Cookbey was the one who grabbed Duncan, tried to force him into the hallway, and shot him. After this conversation, he (Mahon) saw defendant's mother in the hallway and spoke to her. After speaking privately with defendant, her mother came out and said defendant wanted to talk to him again and tell the truth regarding the incident. He returned to the interrogation room and questioned her in the presence of her mother and stepfather. She then related a conversation she had with Charles Gregory Mitchell in an apartment in the Cabrini-Green housing project and repeated her statement regarding the occurrence. She explained that she did not mention Mitchell during prior questioning because he was the father of two of her cousin's children and she wanted to protect him. After this conversation, Mitchell was taken into custody. Before each interrogation defendant was advised of her rights, acknowledged understanding them, and agreed to answer questions. Mahon admitted that he told defendant's mother it would be better for defendant if she told the truth; that the first two conversations with defendant wherein she denied involvement were not reflected in his police reports; that defendant and Mitchell were the only persons arrested in connection with this incident; and that he knew when questioning defendant that she was 19 years old and had only an eighth grade eduction. He de-

nied telling defendant that she was just a witness to the homicide.

Defendant testified that, at the time of the offense, she was living with her mother in the Robert Taylor homes but frequently stayed with her cousins at Cabrini-Green. She met Duncan, who was 43, in a restaurant in the latter part of 1979, and began dating him four or five months later. She saw him twice a week, and he bought her clothes and would give her money if she needed it, but this was not done in exchange for her sexual favors. On September 24, 1980, she met Duncan at a card game in the apartment building and recognized one of the other players, McGee, as an acquaintance of Mitchell. Two days later she met Mitchell and Holmes at her cousins' apartment. She knew Mitchell because he was the father of two of her cousin's children, and was further aware from the way he dressed and talked and certain hand signals that he used that Mitchell was a member of the Disciples street gang. Mitchell stated that he objected to her dating a white man and asked what she knew about the card game. He then told her she was going to get them into that game and, if she refused to cooperate, he would kill her or harm her family. She was frightened and felt she had no choice but to follow his instructions. Mitchell and Holmes left for 15 minutes, then returned with another man and a car. Each time she went to the apartment, Mitchell and Holmes were in the hallway watching her. As they started to leave the second time, they heard the buzzer which opened the front door and became alarmed. Duncan came into the building, and she said, "Bill, let me talk to you," but before she could warn him Mitchell and Holmes approached and ordered him into the hallway. They began struggling, and she heard several shots. She left the building first and saw Holmes and Mitchell run out. Mitchell told her to follow him, but she was afraid he heard her try to warn Duncan and would kill her, so she did not return to the car. As she was walking away, the police arrested her; she had never been arrested before. During the first day, she was kept alone in a locked room or in a cell when not being questioned. They gave her no food until she began hollering that she was hungry, and they provided a slice of bologna and a cup of coffee. She had no other food until the next night when her mother brought her something to eat. She did not go to the apartment building of her own free will but out of fear because Mitchell threatened her family. She had no intention of killing anyone, and Mitchell had never mentioned killing, although she knew both men were armed. She tried to warn Duncan but was unable to do so. Her mother told her the police said she was just a witness and should tell the truth; she did not know until after she had given her statement that she would be charged.

Defendant denied admitting involvement on the night of her arrest but acknowledged that she did not tell any of the officers that the others were Disciples or that they had threatened her, explaining that she was afraid because they had not yet been arrested, and her mother had to return to her apartment alone. She admitted that she gave Porter the names of Cookbey and Joe and that, even after seeing Mitchell in custody, she did not tell of the threats, again because the other two men had not been arrested.

OPINION

■ Defendant first contends that she was denied a fair trial when the trial court gave an erroneous instruction on an essential element of attempted armed robbery. A correct instruction was submitted and agreed upon, and stated in relevant part:

"To sustain the charge of attempt, the State must prove the following propositions:

\* \* \*

*Third*: That the defendant did not act under compulsion."

However, the record indicates that in reading this instruction to the jury, the trial court stated that the State must prove "[t]hat the defendant, *or one for whose conduct she is legally responsible*, did not act under compulsion." (Emphasis added.) Defendant maintains, and the State concedes, that the foregoing is an erroneous statement of the law, and we have so held in *People v. Nugin* (1981), 99 Ill. App. 3d 693, 425 N.E.2d 1163. It is the State's position however, that the question was waived by defendant's failure to object at trial or to raise the issue in her post-trial motion. Defendant argues that the error is so fundamental as to come within the purview of Supreme Court Rule 451(c) (73 Ill. 2d R. 451(c)).

Rule 451(c) provides in relevant part that "substantial defects [in the instructions given in criminal cases] are not waived by failure to make timely objections thereto if the interests of justice require." However, this rule, like Rule 615(a) (73 Ill. 2d R. 615(a)) is "not \* \* \* a general savings clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court" (*People v. Precup* (1978), 73 Ill. 2d 7, 16, 382 N.E.2d 227, 231); rather, "where there is a failure to object to an instruction, waiver is the rule, and the provision of \* \* \* Rule 451(c) constitutes \* \* \* a limited exception [citation], to be used to correct 'grave errors' [citation], or to be applied where the case is close factually and fundamental fairness requires that the jury be properly instructed" (*People v. Roberts* (1979), 75 Ill. 2d 1, 14, 387 N.E.2d 331, 337).

Where the error is considered grave, reversal is required regardless of the evidence against the defendant (*People v. Lucas* (1981), 88 Ill. 2d 245, 255, 430 N.E.2d 1091, 1095-96), but in other cases it is necessary to consider the strength or weakness of the evidence in determining whether the error has been waived, even though substantial rights may be affected (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233). In the instant case, since it is undisputed that error occurred but was never brought to the trial court's attention, we must first determine which standard we are to employ in deciding the applicability of Rule 451(c).

Defendant maintains that the error in question is so grave that reversal is required, regardless of what evidence against her might appear in the record. In support thereof, she cites *People v. Stromblad* (1978), 74 Ill. 2d 35, 383 N.E.2d 969, and *People v. Nugin* (1981), 99 Ill. App. 3d 693, 425 N.E.2d 1163. In *Stromblad*, the jury was misinstructed on the definition of obscenity and the supreme court reversed without evaluating the evidence. Similarly, in *Nugin*, the trial court gave the identical erroneous instruction that was given here, and no correct instruction was ever submitted to the jury. We held that the giving of an erroneous instruction on so essential an element constituted grave error (99 Ill. App. 3d 693, 699, 425 N.E.2d 1163, 1168) requiring reversal, although we went on to note that the case was also closely balanced factually (99 Ill. App. 3d 693, 700, 425 N.E.2d 1163, 1168). It appears, then, that the erroneous instruction given here constituted grave error, requiring reversal despite defendant's failure to object and without regard to the nature of the evidence against her.

The State argues, however, that in this case the error must be considered harmless, citing *People v. Lewis* (1979), 75 Ill. App. 3d 259, 393 N.E.2d 1098. There, an instruction originally tendered by the State was withdrawn when defendant objected, but the trial court inadvertently read it to the jury. The instruction was not submitted to the jury in written form when it retired to deliberate. The reviewing court held that any error in reading the withdrawn instruction to the jury was cured by sending correct written instructions to the jury room. *Lewis* was subsequently relied upon in *People v. Lavas* (1983), 113 Ill. App. 3d 196, 446 N.E.2d 1188, and *People v. Gomez* (1980), 80 Ill. App. 3d 708, 399 N.E.2d 1368, wherein the respective courts held that any error in orally instructing the jury was cured by the fact that correct written instructions were sent to the jury room. The State asserts that, in the instant case, the record shows that correct written instructions were submitted to the jury, pointing to copies of the in-

structions marked "given" and contained in the common law record.

We believe that the above cases are distinguishable. In *Lewis*, the court noted that the record showed that the erroneously included instruction was not submitted to the jury. Similarly, in *Lavas* and *Gomez*, the courts noted that the record affirmatively showed that correct written instructions were sent to the jury room. Here, however, we have only copies of the agreed-upon instructions, and we have held that copies are insufficient proof of the instructions sent to the jury room in the absence of the original instructions actually given to the jury for use during its deliberations or other affirmative showing that correct instructions were sent to the jury room. (*People v. Lewis* (1977), 53 Ill. App. 3d 89, 368 N.E.2d 619; *People v. Wilson* (1976), 43 Ill. App. 3d 583, 357 N.E.2d 81; see also *People v. Ureste* (1972), 7 Ill. App. 3d 545, 288 N.E.2d 45.) There is nothing in the record before us which affirmatively shows that the correct instruction was given. Therefore, we conclude that the jury was not properly instructed, that the error was not cured, and defendant's conviction for attempted armed robbery consequently must be reversed. *People v. Nugin* (1981), 99 Ill. App. 3d 693, 425 N.E.2d 1163.

■ Defendant next contends that she was not proved guilty beyond a reasonable doubt; therefore, she maintains, her conviction must be reversed outright without remand for a new trial. She asserts that the State failed to prove that either she or one for whose conduct she was legally responsible possessed the specific intent to rob Duncan, arguing that the most logical conclusion to be drawn from the evidence is that she and the other participants were not expecting Duncan and were attempting to flee the building when they encountered him. In particular, she notes the lack of evidence that any demand for money was made or that anything of value was taken from Duncan.

Attempted armed robbery consists of an intent to commit the specific offense of armed robbery and an act which constitutes a substantial step toward commission of that offense. (Ill. Rev. Stat. 1979, ch. 38, par. 8—4(a).) The question whether the accused had the requisite intent is for the trier of fact (*People v. Johnson* (1979), 70 Ill. App. 3d 149, 388 N.E.2d 225), and it is not necessary that a specific demand for money be made in order to prove intent; rather, intent may be inferred from the acts of the accused and the surrounding circumstances (*People v. Cheatem* (1976), 35 Ill. App. 3d 414, 342 N.E.2d 410). Moreover, where the facts give rise to more than one inference, we will not substitute our judgment for that of the jury unless the inference which it accepts is inherently impossible or unreasonable. *Peo-*

*ple v. Schaefer* (1980), 87 Ill. App. 3d 192, 409 N.E.2d 129.

In the instant case, defendant and her companions went to the apartment of Daniel Sapp intending to rob the participants in the card game. Defendant was to find out who was there and get the others into the room. When defendant was informed that Duncan was expected but had not arrived, she left but returned later and again asked for Duncan. Sapp testified that there were usually five or six players at a game and, at the time defendant came to his apartment, five players were present. Defendant's accomplices were in the hall, guns ready, prepared to carry out their plan at the second visit to the apartment; yet, upon hearing that Duncan had not arrived, defendant did not set the plan in motion, but again left the apartment. She explained in her statements to the police, as well as in her testimony at trial, that the first visit was merely to check the conditions of the game. However, the second visit was made with the avowed purpose of robbing the people in the apartment, but that plan was not carried forward when Sapp told defendant that Duncan had not yet arrived. From this, the jury might have inferred that Duncan was one of the intended victims and that the conspirators were merely awaiting his arrival before completing their plan. This inference is reinforced by what occurred when Duncan entered the building. Defendant asserts that they were attempting to flee the building and Duncan merely got in the way. However, the testimony indicated that there was a rear entrance which could be opened from the inside without a key, and defendant's statements indicate that her companions had taken the opportunity during the first visit to the building to investigate the means of escape. As a result of that study, their plan called for escaping through the rear door, not the front door, and they parked behind the building for that purpose. Moreover, the inference is further reinforced by the fact that when Duncan approached, Mitchell took out his gun, donned a mask, and ordered Duncan into the hallway. Such conduct gives rise to an inference that the participants planned to take Duncan back to the apartment, gain entrance, and carry out their plan, with Duncan one of the victims. There is nothing inherently impossible or unreasonable about these inferences; therefore, we will not substitute our judgment for that of the jury.

■ Defendant further argues, however, that the only evidence of intent was comprised solely of her statements to the police, and that in order to sustain a conviction based on a confession, it must be corroborated by independent evidence, citing *People v. Willingham* (1982), 89 Ill. 2d 352, 432 N.E.2d 861. It is established that " '*** if there is evidence of corroborating circumstances which tend to prove

the *corpus delicti* and correspond with the circumstances related in the confession, both the circumstances and the confession may be considered in determining whether the *corpus delicti* is sufficiently proved in a given case. ***' " (*People v. Perfecto* (1962), 26 Ill. 2d 228, 229, 186 N.E.2d 258, 259.) However, the State need not prove beyond a reasonable doubt that a crime occurred *exclusively* by evidence independent of the confession (*People v. Willingham*); rather, "if the independent evidence *tends* to prove that an offense occurred, then such evidence, if corroborative of the facts contained in the confession, may be considered along with the confession in establishing the *corpus delicti*" (89 Ill. 2d 352, 361, 432 N.E.2d 861, 865).

Here, defendant repeated at trial that upon visiting the apartment the second time and learning that Duncan had not arrived, she left. This testimony is corroborated by Sapp. Defendant also testified at trial that Mitchell and Holmes approached Duncan with guns drawn and ordered him into the hallway, which, as noted above, is inconsistent with her contention that they were merely trying to leave the scene. Finally, Pappano confirmed that the escape car was parked in the alley behind the building, and that the rear doors could be opened from the inside, which is consistent with the participants' plan to escape through the rear exit, and is inconsistent with defendant's claim that they went to the front of the building in order to flee. It is our view that there is adequate evidence to corroborate defendant's confession, including her own testimony at trial, and that this same evidence tends to show that an offense occurred.

■■ Finally, defendant contends that, on remand, all statements made by her should be excluded. She maintains that, given the totality of the circumstances, including her age, intelligence, lack of prior contact with the police, alleged inducements, and the length of time she was interrogated and the conditions thereof, the trial court erred in finding that her statements were voluntarily made.

The State bears the burden of proving by a preponderance of the evidence that a defendant has been warned of her constitutional rights and waived them (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *People v. Ybarra* (1977), 46 Ill. App. 3d 1049, 361 N.E.2d 678), and the findings of the trial court on this issue will not be overturned unless contrary to the manifest weight of the evidence (*People v. Willis* (1975), 26 Ill. App. 3d 518, 325 N.E.2d 715). A valid waiver is generally properly found where a defendant has been advised of her *Miranda* rights and has acknowledged understanding them prior to making a statement (*People v. Genus* (1979), 74 Ill. App. 3d 1002, 393 N.E.2d 1162); however, the totality of the

circumstances must be considered in determining whether a statement was freely made, without compulsion or inducement (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731), and the court must examine "the intensity of the interrogation, failure to warn of constitutional rights and defendant's age, experience and education" in considering the voluntariness of a statement (*People v. Lopez* (1981), 93 Ill. App. 3d 152, 156, 416 N.E.2d 1127, 1130).

■ Initially, defendant asserts that we must presume that she could not understand the *Miranda* warnings recited to her on at least nine separate occasions and posted on the wall in a room where she was sitting, despite the fact that she acknowledged understanding them, because they were not explained to her in "simplified" language. In support of this argument, she points out that she was 19 years old, had never been arrested before, had only an eighth grade education, and was of "very low intelligence." We note that while there is testimony from defendant's mother that she attended a school for "slow learners," there is nothing in this record to indicate that defendant is of low intelligence. Moreover, the trial court had an opportunity to hear and observe her responses to questions, and apparently was satisfied that her vocabulary and understanding of language were adequate. Age and limited education or intelligence do not raise a presumption of incapacity, as we have repeatedly pointed out, but are factors to be considered, and we have found knowing, intelligent waivers by defendants with similar backgrounds to the one reflected in the record before us. (See *People v. Hebein* (1982), 111 Ill. App. 3d 830, 444 N.E.2d 782; *People v. Marek* (1980), 92 Ill. App. 3d 746, 415 N.E.2d 1230; *People v. Avery* (1980), 88 Ill. App. 3d 771, 410 N.E.2d 1093.) In addition, we have read the warnings given, and do not believe that the language thereof is any more sophisticated or difficult to understand than the questions defendant answered during her testimony at the pretrial hearing and at trial without apparent problems or need for simplification.

■ Defendant further argues that the two-day delay in bringing her before the court for a preliminary hearing is indicative of coercion. We agree that defendant has a right to be taken before a court without unnecessary delay (*People v. Taylor* (1965), 33 Ill. 2d 417, 211 N.E.2d 673); however, delay of itself does not render a statement involuntary in the absence of a showing that the delay contributed to the making of the statement (*People v. Higgins* (1972), 50 Ill. 2d 221, 278 N.E.2d 68, *cert. denied* (1972), 409 U.S. 855, 34 L. Ed. 2d 100, 93 S. Ct. 195; *People v. Byrd* (1980), 90 Ill. App. 3d 429, 413 N.E.2d

148). Here, the testimony is clear that defendant made her first incriminating statement within a few hours of her arrest, and repeated substantially the same statement at regular intervals. We find no indication that, nor has defendant explained how, the delay in any way contributed to the making of these statements.

■ Defendant next maintains that her statement was procured by inducements and by repeated questioning while she was tired, deprived of food, and had been denied the opportunity to speak to her mother. We have examined the record and find ample evidence from which the trial court could conclude that these allegedly coercive circumstances did not occur.

Defendant and her mother insisted that she was told she was "just a witness" and that, if she told the truth, she would be released. She further contends that she had no idea that she would be charged until after these statements were made. These assertions are contradicted by the State's witnesses. Each material witness was produced and testified that no promises were made to defendant or to her mother during the course of questioning. Moreover, there is further testimony that defendant was informed that she was under arrest in connection with murder before any statements were made, and that her mother was also so informed. Nevertheless, defendant points to Investigator Mahon's admission that he told her mother it would be better for defendant to tell the truth, asserting that her mother then "acted as an agent of the police" in advising her to tell the truth. Leaving aside the agency question, for which defendant cites not authority, we note that Mahon's statement occurred only after defendant made two incriminating statements; at that point, the only truth left to be told was the identity of one of the other participants. Furthermore, admonitions to tell the truth, in the absence of any promises in exchange therefor, do not of themselves render a statement involuntary. *People v. Boyd* (1980), 88 Ill. App. 3d 825, 410 N.E.2d 931, *cert. denied* (1981), 454 U.S. 1080, 70 L. Ed. 2d 613, 102 S. Ct. 633; *People v. McCue* (1977), 48 Ill. App. 3d 41, 362 N.E.2d 760.

■ Defendant's assertion that she was repeatedly questioned while tired and hungry is similarly contradicted. The evidence supports the trial court's finding that defendant was in the lockup for 12 to 15 hours each day, and that prisoners there are fed and have the opportunity to sleep. Moreover, defendant's own written statement, wherein she stated that she was not physically abused and had been allowed to eat, contradicts her testimony at the hearing. Additionally, even if defendant were tired, a fact which several witnesses refuted, so long as she was given an opportunity to rest, her statement will

not be considered involuntary simply because she was tired. *People v. Byrd* (1980), 90 Ill. App. 3d 429, 413 N.E.2d 148.

Turning to defendant's argument that she was denied an opportunity to speak to her mother, we note that her assertion that only one of the witnesses denied that she asked to call her mother is contrary to the evidence. In fact, each officer who was involved in questioning defendant testified that she never asked to speak to her mother. The trial court apparently found these four witnesses more credible, and it is not our function on appeal to reassess the credibility of witnesses or redetermine the weight to be given their testimony. Having considered each of defendant's arguments and examined the record herein, we conclude that the trial court's determination on the voluntariness of defendant's statements is not against the manifest weight of the evidence.

■ For the reasons stated, defendant's conviction for the attempted armed robbery of William Duncan is reversed and the cause remanded for a new trial on that issue. We further note, however, and defendant concedes, that the trial court erred in ruling that the conspiracy conviction merged with the attempt conviction. While it is true that a defendant may not be convicted of both the inchoate and the principal offense (*People v. Hill* (1980), 78 Ill. 2d 465, 401 N.E.2d 517), the two convictions may stand where the object of the conspiracy was broader than the specific crime committed (see *People v. Bolla* (1983), 114 Ill. App. 3d 442, 448 N.E.2d 996). Here, defendant was convicted of conspiracy to rob the card players, which includes criminal objectives other than the attempted armed robbery of William Duncan. Therefore, pursuant to our powers under Supreme Court Rule 615(b)(2) (73 Ill. 2d R. 615(b)(2)), we direct the circuit court on remand to enter judgment and impose sentence on defendant's conspiracy conviction.[1] See *People v. Dixon* (1982), 91 Ill. 2d 346, 438 N.E.2d 180.

Reversed and remanded with directions.

WILSON, P.J., and MEJDA, J., concur.

---

[1]Defendant maintains that remand in the instant case would be "fundamentally unfair," despite her concession that the trial court erred, because she would be denied her right to appeal the conspiracy conviction. Assuming that defendant is correct in stating that the trial court effectively precluded appeal (but see *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1), she does not cite any authority for her apparent further assumption that once a final judgment is entered on the conspiracy conviction, it cannot be appealed.