THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FLE-NEAR JEFFERSON, Defendant-Appellant.

First District (2nd Division)   No. 1—90—1117

Opinion filed April 5, 1994.—Rehearing denied April 28, 1994.

Rita A. Fry, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E.

Fitzgerald, and Christine Perille, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

In the afternoon of June 14, 1987, 13-year-old Tamara Washington was shot and killed while she played jump rope with friends outside her grandmother's house at 6840 South Winchester in the City of Chicago. Defendant and his half-brother, Freddie Jefferson (Freddie), were arrested and charged by indictment in connection with the shooting. Their trials were severed and we affirmed Freddie's murder conviction in *People v. Jefferson* (1992), 227 Ill. App. 3d 491, 592 N.E.2d 134, *appeal denied* (1992), 145 Ill. 2d 639, 596 N.E.2d 633.

At defendant's trial, Dr. Nancy Jones, deputy medical examiner, testified that Tamara died from a gunshot wound to the back, describing it as "a typical wound of entrance" which was not caused by a ricochet bullet. She was unable to identify the caliber of the bullet.

Michael Crawford testified that in the afternoon on the day of the shooting, Joe Jefferson (Joe)[1] and Erik Lamont Green were with him on his porch at 6744 South Winchester. A fistfight broke out between Joe and Green, and, after Crawford and his brother broke it up, Green ripped the window out of Joe's car, which was parked across the street. Crawford's mother called the police and told her son to take Joe home, but instead Crawford and Joe went to defendant's apartment. Crawford stood outside the closed apartment door, because he was afraid of defendant's pit bull dog, and from there he heard Joe tell defendant that Green had "jumped" him. When Joe, Freddie and defendant emerged from the apartment, Crawford and Joe provided defendant with Green's address and description. Crawford recalled that when defendant saw Joe's car, he "looked mad." Defendant sent Crawford and Joe home and he and Freddie drove away in defendant's brown Cadillac Seville. Crawford did not see defendant carrying a gun.

Michael Torrence testified, acknowledging that he was serving a 25-year prison sentence for armed robbery in Arkansas concurrently with an Illinois sentence. He stated that the State had not made him any promises in exchange for his testimony except to try to have him transferred to Illinois. Torrence testified that he had had a business relationship with defendant and that on the day of the shooting, he

---

[1]Joe and defendant have the same mother; Freddie and defendant have the same father. Freddie and Joe are unrelated, although they have the same last name.

was at defendant's apartment with Freddie and Melvin Duncan, defendant's uncle. He recalled that Joe left the room to "freshen up" after telling them about his fight with Green. While Joe was gone, defendant took out a white plastic bag containing two pistols and put one in the left side of his pants. Torrence remembered defendant's stating that "people in this city think that I'm soft, something has to be done about it," and that he was going to "pistol whip" Green. Defendant offered Torrence "some of the action" but Torrence declined because he wanted to visit his child. Freddie, defendant, and Torrence then left the apartment and defendant drove Torrence to an El stop.

On cross-examination, Torrence revealed that he had been brought back to Illinois from Arkansas because of an outstanding warrant for his arrest on charges of aggravated criminal sexual assault and home invasion. After he pleaded guilty to those charges and was sentenced, prosecutors contacted him regarding the present case, but he did not cooperate with them until they offered to try to have him transferred to Illinois to serve his sentences.

Green testified that he was walking out of his sister's yard on Winchester when he observed a brown Cadillac driving north as it exited the grocery store parking lot across the street. Green saw Curtis Moore approach the car, talk with its occupants, and then look in Green's direction, apparently pointing him out to the people in the car. The driver, whom Green identified at trial as defendant, exited the car and walked towards him. When Green saw him reach behind his back, he began running north on the west side of the street. He also saw the passenger emerge from the car and cross around the back of it. Green recalled that he then heard at least four or five gunshots and "felt some shots coming past me." He ran into a vacant lot where he remained for about five minutes. When he came out, he saw a crowd around Tamara, who was lying on the ground. The following day, Green viewed a lineup and apparently identified defendant and Freddie, although the record lacks an express statement to that effect. Green was uncertain whether Freddie or defendant did the shooting, stating that "I don't know which gun did the shooting but one of them did it."

On cross-examination, Green admitted that in previous testimony he had stated that the man on the passenger side of the car got out first, reached behind his back, and started to approach him. He also stated that even though he could not see the gun, he "could feel" it pointed at him.

Curtis Moore testified that he was talking with Green near the grocery store on Winchester when the brown Cadillac, driven by de-

fendant, pulled up. Two passengers were in the car and Moore approached them to see if they wanted to purchase some marijuana. He testified that the passenger jumped out of the car, came around to the driver's side, and that defendant then got out and reached behind his back. He saw Green start running and "then they started shooting." Moore jumped over a fence to avoid the gunfire. On direct examination, Moore stated that he could not tell whether the passenger or the driver did the shooting; however, on cross-examination, he admitted that about one hour after the shooting, he told the police that the passenger shot at Green. He identified both men from photographs at the police station.

Several neighbors witnessed the shooting. Lena Robinson, Tamara's grandmother's next-door neighbor, testified that she was on her porch when she overheard the conversation between Moore and the driver of the brown Cadillac. She then saw someone get out of the car, walk north, and shoot his gun in a westerly, then northerly, direction. Robinson ducked down on her porch because the shooter "was aiming towards Lamont Green where I was sitting on the porch." When she looked up, the car was gone and she saw Tamara fall. Curtis Higgins, who resides at 6838 South Winchester, testified that he was on his porch when he saw a man standing outside the passenger side of a car parked near the grocery store. He then saw the man walking away from the car while "fanning" a gun. Frank Leon Coleman, who lived at 6812 South Winchester, testified that he was walking north on Winchester when he observed the brown Cadillac and saw Green about 20 feet behind him, coming from an alley onto South Winchester. After Moore pointed Green out, the shooting started and Coleman ducked down on Higgins' porch. He noted part of the car's license number as it drove away and subsequently gave the numbers to the police. Bryant Banks testified that he was in his front yard at 6835 South Winchester when he heard shots and turned to see a man pointing a gun and sweeping it from left to right. He then saw Green running away as the shooter followed him.

The next day, Robinson, Coleman, and Banks identified Freddie as the shooter. None of them could tell how many people were in the car with Freddie.

Detective Michael Kill testified that on June 15, 1987, defendant reported his car stolen to the Robbins police. Kill went to the Robbins police station and, after advising defendant of his *Miranda* rights, spoke with him about the shooting. Defendant stated that he assured Joe that he would "take care of it" after Joe told him about his fight with Green. He and Freddie went to 68th and Winchester to look for Green, and after they located him, they both exited the car

and walked towards him. Defendant recalled that he stood between Freddie and Green when he heard three shots, turned, and saw Freddie shoot once more, using a silver .32-caliber revolver. He and Freddie got back in the car and drove away. Defendant dropped Freddie off at 70th and Loomis, took the car to his girl friend's house, and told her to take it to a relative's house in Park Forest. On cross-examination, Kill stated that defendant said that he reported his car stolen after he learned that someone had been shot and that he did not know that Freddie had a gun until he heard the shooting.

Outside the presence of the jury, but prior to Torrence's testimony, the trial judge had ruled that defendant's conviction of armed robbery in Arkansas, which occurred while he was released on bond for the crime in this case, could not be explored by the State when questioning Torrence. However, the court permitted questioning related to defendant's plan to raise money to post bond for Freddie and to his intent to leave the jurisdiction, finding that that evidence was relevant and that it was indicative of a guilty conscience and intent to flee. The judge permitted defendant to question Torrence regarding defendant's claim that he did not know why his brother shot like "a maniac," but barred any reference to defendant's having made that assertion while in an Arkansas penitentiary. He later instructed the jury not to consider evidence that defendant had been involved in other crimes, limiting it to the issue of "defendant's intent or knowledge."

Torrence then testified before the jury that several weeks after the shooting, defendant told him that he needed to raise a large amount of money in order that he could go Freddie's bail and they could both flee the jurisdiction. At that time, defendant again showed him the white plastic bag containing guns. He was unsure if it also contained the pistols he saw on June 14, although while in Arkansas with defendant he saw the silver-plated .9-millimeter pistol defendant had put in his pants on the day of the shooting. Torrence stated that in Arkansas, defendant talked about the shooting with several people who were "smoking some reefer and standing around" and that he stated that he "didn't understand why his brother had jumped out of the car and got to shooting like he was a maniac." According to Torrence, defendant also stated that on June 14, he had brought two more guns to "South Winchester" in case they were needed. Torrence recalled that he and defendant test-fired a semi-automatic Uzi in Arkansas.

Joe testified as the sole witness for defendant. He stated that after his altercation with Green, he spoke with the police, but that they stated "they couldn't do anything about it." He contended that

when he and Crawford went to defendant's apartment, Crawford did not go up to the apartment. Joe also stated that he never entered the apartment, but spoke to his brother from the doorway. He said that he could see all of the people in the apartment and that only defendant and Freddie were there. He denied that defendant had a bag of guns and stated that neither defendant nor Freddie had a gun in his hands. Joe remembered that when defendant and Freddie left the apartment, defendant said that "he was going to talk to" Green and that Joe should go home. On cross-examination, Joe stated that his car was a high school graduation gift from defendant and that defendant and Freddie were angered when they saw that it had been damaged. He admitted that it was unusual for defendant to have his door open because of his dog, but he claimed that the dog was chained while he spoke with defendant.

Defendant was convicted by a jury of knowing or intentional murder, murder during a felony, and attempted murder. (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1) through (a)(3), 8—4.) The trial judge sentenced him to concurrent terms of 40 years for murder and 30 years for attempted murder to be served consecutive to the 20-year term he was serving in Arkansas.[2] The judge denied defendant's motions for a new trial and to reduce his sentences, but he vacated the felony murder conviction. Defendant now appeals both his conviction and his sentences, alleging numerous errors of the trial court.

I

Defendant first argues that he was denied a fair trial when the trial court inserted accountability language into the second paragraph of each instruction (Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c)), thereby misleading the jury into believing that defendant could be found guilty of intentional murder and attempted murder even if he lacked the requisite intent and had no knowledge of Freddie's criminal intent.

The State correctly asserts that defendant waived this issue by failing to object to the accountability instruction at trial and by omitting a claim of error regarding accountability in his post-trial motion. See *People v. Jones* (1986), 148 Ill. App. 3d 345, 354, 499 N.E.2d 510, 516 (holding that the defendant waived his claim of error regarding a deficient instruction when he failed to object at trial, ten-

---

[2]The documents from the Arkansas Department of Corrections were unclear regarding whether defendant had been convicted of armed robbery or attempted armed robbery.

der a correct instruction, or mention the error in his post-trial motion); see also *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (*"Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial"). (Emphasis in original.)

In any event, this matter would not merit consideration even if we chose to exercise our discretion under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), because our supreme court has addressed the precise issue raised by defendant and has held that an accused can be held accountable for murder or attempted murder even if the State does not prove the requisite intent for those crimes. (See *People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746; *People v. Kessler* (1974), 57 Ill. 2d 493, 315 N.E.2d 29.) The *Terry* defendants, like defendant at bar, argued that they could not be held legally accountable for murder when the State failed to show that they had the requisite intent. The supreme court disagreed, noting that the law on accountability had been construed as "incorporating the long established 'common-design rule[ ]' *** [t]hat *** provides, 'where two or more persons engage in a common criminal design or agreement, any acts in furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts.' " (*Terry*, 99 Ill. 2d at 514, 460 N.E.2d at 749, quoting *Kessler*, 57 Ill. 2d at 496-97, 315 N.E.2d at 32.) And, in *Kessler*, the supreme court held that the defendant could be held legally accountable for attempted murder even though the State showed the intent required for only robbery and burglary. *Kessler*, 57 Ill. 2d at 496-98, 315 N.E.2d at 31-33; accord *People v. Figures* (1991), 216 Ill. App. 3d 398, 404, 576 N.E.2d 1089, 1093 (attempted murder); *People v. Taylor* (1990), 199 Ill. App. 3d 933, 940-41, 557 N.E.2d 917, 923, *appeal denied* (1990), 135 Ill. 2d 565, 564 N.E.2d 846 (murder); *People v. Miscichowski* (1986), 143 Ill. App. 3d 646, 655-56, 493 N.E.2d 135, 141-42 (involuntary manslaughter); *People v. Rodriguez* (1983), 117 Ill. App. 3d 761, 766-67, 454 N.E.2d 13, 16-17 (attempted murder); see Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c).

Despite this plethora of authority on the issue, defendant relies on *People v. Nugin* (1981), 99 Ill. App. 3d 693, 425 N.E.2d 1163, and *People v. Allen* (1983), 116 Ill. App. 3d 996, 452 N.E.2d 636, *rev'd in part* (1985), 109 Ill. 2d 177, 486 N.E.2d 873, in support of his contention that the jury was improperly instructed on accountability. In *Nugin*, the defendant claimed that the trial court erroneously gave an accountability instruction on an aggravated battery count when his defense was compulsion. The instruction informed the jury

that the State needed to prove "[t]hat the defendant or one for whose conduct the defendant is responsible did not act under compulsion." (*Nugin,* 99 Ill. App. 3d at 696-97, 425 N.E.2d at 1165-66.) We held that the instruction constituted reversible error because "a person acting under compulsion cannot be held responsible for the criminal acts of another since criminal responsibility contemplates an 'intent to promote or facilitate' the commission of a crime." *Nugin,* 99 Ill. App. 3d at 697-98, 425 N.E.2d at 1167-68, quoting Ill. Rev. Stat. 1979, ch. 38, par. 5—2(c); see also *Allen,* 116 Ill. App. 3d at 1006-08, 452 N.E.2d at 644-45 (holding that use of the same accountability instruction in an attempted armed robbery case was reversible error when the defendant's defense was compulsion).

The present case is readily distinguishable. Unlike *Nugin* and *Allen,* defendant in the case at bar did not put forth a compulsion defense which, if believed, would have negated any criminal intent. *People v. Raya* (1993), 250 Ill. App. 3d 795, 621 N.E.2d 222, *appeal denied* (1993), 153 Ill. 2d 567, 624 N.E.2d 814, also relied on by defendant, is similarly distinguishable. In that case, the defendant was convicted of unlawful possession of a controlled substance with the intent to deliver based on his asking a cocaine dealer to bring some of the drug to a party. We held that the defendant could not be held accountable for possession with intent to deliver, because this situation fit clearly within section 5—2(c)(2) of the accountability statute, which states that a person is not accountable when her conduct is inevitably incident to the commission of the crime. (*Raya,* 250 Ill. App. 3d at 799-801, 621 N.E.2d at 223-26; see also Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c)(2).) We reasoned that if the *Raya* defendant were held legally accountable, then any person who sought drugs for personal use could be held accountable for the supplier's possession with the intent to deliver. (*Raya,* 250 Ill. App. 3d at 800-01, 621 N.E.2d at 226.) Attempted murder and murder are not inevitably incident to the commission of any crime and *Raya,* therefore, is inapposite. Consequently, even if the plain error rule were applicable, defendant could not prevail with his argument that the jury was incorrectly instructed on accountability.

## II

Defendant next argues that the trial court violated his rights to confrontation and to a fair trial by unduly restricting his cross-examination of Green, the intended victim. At a sidebar, defense counsel informed the court that he planned to question Green about his gang membership. The judge sustained the State's objection, stating that Green's gang membership, to which he admitted about

13 months before trial when he was arrested on an unrelated charge, was irrelevant to his bias or prejudice in this case.

Defendants have a constitutional right to cross-examine witnesses for the purpose of showing bias, prejudice, or a motive to falsify testimony. (U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8; see also *Davis v. Alaska* (1974), 415 U.S. 308, 316, 39 L. Ed. 2d 347, 354, 94 S. Ct. 1105, 1110 ("the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination").) However, while defendants are granted wide latitude in conducting cross-examination to show bias, a trial judge may impose limits on such inquiry (see *People v. Winfield* (1983), 113 Ill. App. 3d 818, 831, 447 N.E.2d 1029, 1040), such as restricting interrogation in order to avoid harassment, prejudice, confusion of the issues, and repetitive or irrelevant testimony (*People v. Harris* (1988), 123 Ill. 2d 113, 144, 526 N.E.2d 335, 348), and the defendant may be prevented from delving into evidence which is remote and uncertain (*People v. Johnson* (1992), 239 Ill. App. 3d 1064, 1072, 608 N.E.2d 36, 43, *appeal denied* (1993), 151 Ill. 2d 571, 616 N.E.2d 341). A trial judge's limitation of the defendant's attempt to show bias will be reversed only if there has been an abuse of discretion resulting in manifest prejudice to the defendant. *Winfield*, 113 Ill. App. 3d at 831, 447 N.E.2d at 1040.

Defendant relies on *People v. Gonzalez* (1984), 104 Ill. 2d 332, 472 N.E.2d 417, for the proposition that gang membership is admissible to cast doubt on a witness' credibility. However, the *Gonzalez* court held that forbidding any questions on the witness' gang membership constituted reversible error in that case because "[g]ang affiliation and the concerted activity of the gang in threatening the defendant and harassing his family formed the very basis of the defense theory." (*Gonzalez*, 104 Ill. 2d at 338, 472 N.E.2d at 420.) The *Gonzalez* defendant asserted that the witness had fabricated his testimony either as a means for the gang "to get him" or to avoid being implicated in the crime himself. *Gonzalez*, 104 Ill. 2d at 335, 472 N.E.2d at 419.

■ In contrast, in the case at bar, Green's gang membership was completely unrelated to the crime and defendant does not contend that it was in any way relevant to his defense theory. Since Green's gang membership was not in any way relevant to any issue at trial, we hold that the judge did not abuse his discretion in prohibiting questioning on that matter. See *People v. Clark* (1984), 129 Ill. App. 3d 374, 377-78, 472 N.E.2d 814, 817 (evidence of victims' gang membership was properly excluded when its relevancy was highly speculative); see also *People v. Maldonado* (1992), 240 Ill. App. 3d 470, 475, 608 N.E.2d 499, 503, *appeal denied* (1993), 151 Ill. 2d 572, 616 N.E.2d 343.

Defendant also argues that the trial court erroneously prevented him from pursuing a line of questioning regarding an outstanding warrant for Green. After defense counsel asked Green if there was a $10,000 warrant out for him, Green denied it, and, as counsel attempted to continue his questioning, the State objected, arguing that once the witness denied knowledge of the warrant, defense counsel had to accept his answer, because this was a collateral issue. The trial judge sustained the objection, stating, "[w]ell, you can ask him about the charges that he's got presently pending against him."

Matters pertaining to a witness' bias or prejudice in a criminal trial are not considered collateral, and the witness' answers may be contradicted with other testimony. (See *People v. Garrett* (1976), 44 Ill. App. 3d 429, 437, 358 N.E.2d 364, 370; see also *People v. Wilkerson* (1981), 87 Ill. 2d 151, 156, 429 N.E.2d 526, 527-28; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §§ 607.7, 607.8, at 358-63 (5th ed. 1990).) In *People v. Richmond* (1980), 84 Ill. App. 3d 1017, 406 N.E.2d 135, we held that the trial court improperly prevented defense counsel from asking a witness whether she was aware of outstanding warrants against her. There, when defense counsel questioned the witness outside the presence of the jury, she at first denied knowledge of the warrants, then admitted that she was aware of them. The trial court prohibited this line of questioning before the jury, citing prejudice to the witness. (*Richmond*, 84 Ill. App. 3d at 1018, 406 N.E.2d at 136.) We reversed, noting that even if the witness denied she was testifying in exchange for leniency from the prosecution, the defendant had a right to have the jury assess her credibility. *Richmond*, 84 Ill. App. 3d at 1019, 406 N.E.2d at 137-38.

The State argues that defendant could have presented evidence of the warrant through his own witnesses. However, the trial court indicated that it was foreclosing further inquiry on the matter when it sustained the State's objection and stated that defense counsel could ask Green about pending charges. Since the existence of the outstanding warrant was relevant to show bias, the trial court erred in sustaining the objection.

Nonetheless, such error does not mandate reversal in the present case. (See *People v. Porter* (1981), 96 Ill. App. 3d 976, 982-83, 422 N.E.2d 213, 218.) Our supreme court has stated that the critical inquiry in determining whether reversible error has occurred when the defendant's cross-examination of an adverse witness has been restricted is whether the defendant's inability to make the inquiry created a substantial risk of prejudice by denying her the opportunity to test the truth of the witness' direct testimony. (*Harris*, 123 Ill. 2d

at 145, 526 N.E.2d at 348.) That assessment should be made by viewing the record as a whole and the alternative means available to impeach the witness; if the entire record indicates that the jury has been made aware of "adequate factors concerning relevant areas of impeachment," there has been no constitutional violation. *Harris*, 123 Ill. 2d at 145, 526 N.E.2d at 348.

Here, defense counsel elicited from Green the facts that he had been arrested on February 6, 1989, on a felony drug charge, that he had a court date pending, and that he was facing the possibility of a 6- to 30-year term of imprisonment on that charge. Although Green denied that the prosecution had made him any promises in exchange for his testimony, revelation of the pending charge provided the jury with information which may have influenced the weight it attached to his testimony. Unlike *Richmond*, defendant was permitted to expose the possibility that Green was attempting to curry favor with the prosecution by testifying, thereby permitting the jury to draw the inference that he had something to gain through his testimony. Thus, defendant was not denied a fair trial, and any error committed by the trial court was harmless beyond a reasonable doubt. See *Harris*, 123 Ill. 2d at 148, 526 N.E.2d at 350.

### III

Defendant next argues that the trial court's ruling to admit evidence of his possession of weapons for the purpose of raising money to post bail for Freddie and to flee the jurisdiction was so prejudicial that it outweighed any probative value and served only to unfairly bolster Torrence's credibility.[3]

Generally, evidence of other crimes or misconduct by the defendant is inadmissible if its sole purpose is to show the defendant's character or propensity to commit crime. The rationale for this rule is the recognition that the jury may infer that if the defendant committed other crimes, she likely committed the crime charged (*People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 484, 485 N.E.2d 1292, 1296), or the jury may be swayed to convict based only on its perception that the defendant is a bad person deserving of punishment (*People v. Lindgren* (1980), 79 Ill. 2d 129, 137, 402 N.E.2d 238, 242). However, such evidence is admissible if relevant to any other material issue, including the showing of knowledge, consciousness of guilt, intent, motive, or identity. (See *People v. Bean* (1990), 137 Ill.

---

[3]Defendant also complains that Torrence's testimony indicated that defendant was smoking marijuana, but since he failed to object to that at trial, the issue is waived. *Enoch*, 122 Ill. 2d at 186, 522 N.E.2d at 1130.

2d 65, 109-10, 560 N.E.2d 258, 277-78; *People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, 823-24.) When other crimes evidence is offered, the trial judge is obligated to balance its prejudicial effect on the defendant against its probative value, and her ruling will not be disturbed by a reviewing court absent a clear showing of an abuse of discretion. *People v. Thingvold* (1991), 145 Ill. 2d 441, 452-53, 584 N.E.2d 89, 93-94.

Defendant argues that the State was permitted to introduce evidence of his conviction through insinuation. He contends that Torrence's testimony that defendant wanted to raise a large amount of cash and his references to an Uzi and other unidentified weapons unduly prejudiced and inflamed the jury.

We find that the cases defendant cites to support his contention that the trial judge abused his discretion are inapposite. For example, in *People v. Barnes* (1989), 182 Ill. App. 3d 75, 537 N.E.2d 949, an unlawful use of firearms case, the State questioned the defendant, his companion, and three police officers about a large amount of cash the defendant had at the time he allegedly committed the crime. The State again emphasized the defendant's possession of the cash in closing argument. (*Barnes*, 182 Ill. App. 3d at 80-83, 537 N.E.2d at 952-54.) We held that such bad character evidence was inadmissible because "clearly the amount of cash recovered from defendant's possession was irrelevant to proving he was guilty of the unlawful use of a firearm[,] *** [y]et from the very onset of trial *** the jury was bombarded with this irrelevant evidence, which took on the appearance of being a central issue to be considered by the jury in its assessment of defendant's credibility and which could only have suggested to the jury that the cash was obtained through some illegal means." *Barnes*, 182 Ill. App. 3d at 83-84, 537 N.E.2d at 954.

Similarly, in *People v. Thomas* (1974), 18 Ill. App. 3d 306, 309 N.E.2d 744, the trial court permitted a State's witness to testify about the defendant's involvement in growing and selling marijuana. We held that this evidence was inadmissible for the reason that it was irrelevant to the unlawful use of weapons charge for which the defendant was on trial, and that its prejudicial effect far outweighed its probative value. See *Thomas*, 18 Ill. App. 3d at 311-12, 309 N.E.2d at 747-48.

■ In the case at bar, the trial judge properly ruled that the evidence linking defendant to the weapon used in the shooting and indicating that he intended to flee the jurisdiction to avoid trial was relevant to his consciousness of guilt and his intent to flee. Unlike *Barnes* and *Thomas*, we cannot conclude here that the prejudicial effect of this evidence outweighed its probative value. (See *People v.*

*Stewart* (1984), 105 Ill. 2d 22, 59-61, 473 N.E.2d 840, 859-60 (evidence that the murder defendant committed an armed robbery, taking the victim's gun and camera equipment, was properly admitted when the gun was shown to be the murder weapon); *McKibbins,* 96 Ill. 2d at 185-87, 449 N.E.2d at 823-25 (evidence that the defendant was arrested for murder while robbing a jewelry store was admissible since it was relevant to show the circumstances of his arrest and similarities between the two crimes).) Moreover, we find that the admissibility of the evidence in the present case is unaffected by its tendency, if any, to bolster Torrence's credibility. See *Kimbrough,* 138 Ill. App. 3d at 488, 485 N.E.2d at 1298 (otherwise admissible testimony will not be excluded merely because it shows that the defendant committed another crime or because it enhances or bolsters the testimony of a State's witness).

### IV

Defendant next argues that the trial judge's refusal to instruct the jury on aggravated assault as a lesser included offense of attempted murder constitutes reversible error.

It is well established in Illinois that a defendant is entitled to an instruction on a lesser included offense even if there is only slight evidence in the record to support giving the instruction. (See *People v. Pedersen* (1990), 195 Ill. App. 3d 121, 126, 551 N.E.2d 1087, 1090.) The rationale for permitting the instruction is that it gives the jury a third option if it believes that the defendant is guilty of something, but not the greater offense, and thus avoids having the jury acquit rather than convict of the greater offense. *People v. Bryant* (1986), 113 Ill. 2d 497, 502, 499 N.E.2d 413, 415.

A lesser included offense has traditionally been defined as one which contains some, but not all, of the elements of the greater offense and which does not have any element not included in the greater offense. (See *People v. Jones* (1992), 149 Ill. 2d 288, 292-93, 595 N.E.2d 1071, 1073; Ill. Rev. Stat. 1987, ch. 38, par. 2—9(a).) In *Bryant,* our supreme court expanded this analysis when it held that if the charging instrument laid the "broad foundation" or "main outline" for the lesser offense and the evidence adduced at trial supported the lesser offense, then the jury could be instructed on the lesser offense. *Bryant,* 113 Ill. 2d at 504-06, 499 N.E.2d at 416-17; see *Jones,* 149 Ill. 2d at 296-98, 595 N.E.2d at 1076 (holding that the robbery defendant was properly convicted of theft as a lesser included offense when the charging instrument impliedly contained the requisite conduct and knowledge elements of theft and evidence adduced at trial that the defendant took control of property without the owners' permission supported a theft charge).

In the present case, defendant concedes that under an analysis comparing the two statutes, aggravated assault is not a lesser included offense of attempted murder because an element of aggravated assault requires the offender to place another in reasonable apprehension of receiving a battery, while attempted murder may be committed without regard to the victim's state of mind. (Ill. Rev. Stat. 1987, ch. 38, pars. 8—4, 12—2(a)(1); see *People v. Tiller* (1978), 61 Ill. App. 3d 785, 795, 378 N.E.2d 282, 290.) Defendant urges us to find that aggravated assault is a lesser offense under the *Bryant* analysis.

We find that defendant's case is closely aligned with *People v. Kimball* (1993), 243 Ill. App. 3d 1096, 614 N.E.2d 273. In that case, the defendant's indictment charged that he "without lawful justification with the intent to commit the offense of murder, intentionally and knowingly attempted to kill [the victim] by shooting at him with a gun." (*Kimball*, 243 Ill. App. 3d at 1099, 614 N.E.2d at 276.) Evidence presented at his trial revealed that the defendant and his codefendant had approached the decedent in a fast-food parking lot, that the defendant aimed his gun directly at his intended victim, who was in his car, and that he began shooting as the intended victim drove away. (*Kimball*, 243 Ill. App. 3d at 1097, 1099, 614 N.E.2d at 274, 276.) This evidence could not lead to the inference that the defendant meant only to frighten the victim. Furthermore, the language of the indictment did not contain the main outline of aggravated assault since it indicated that the defendant shot at his intended victim. See *Kimball*, 243 Ill. App. 3d at 1099, 1100, 614 N.E.2d at 274, 276. Compare with *People v. Krueger* (1988), 176 Ill. App. 3d 625, 531 N.E.2d 396 (aggravated assault instruction was proper when the defendant shot only at the intended victim's house even though the intended victim was visible behind sheer drapes, and the indictment for attempted murder set forth the main outline of aggravated assault by charging that the defendant shot from close range at the victim's house knowing him to be inside); *People v. Ross* (1992), 226 Ill. App. 3d 392, 589 N.E.2d 854 (trial court erred in not instructing the jury on aggravated assault when the evidence showed that the defendant pointed his gun, without shooting, at a police officer and the indictment for attempted murder charged that he aimed a gun at the officer).

■ In the present case, the indictment charged that defendant "without lawful justification with intent to commit the offense of murder, intentionally and knowingly attempted to kill Eric Green by shooting at him with a handgun." Like *Kimball*, this indictment does not contain the main outline of aggravated assault since shooting directly at an individual does not reflect an intent to merely frighten.

Additionally, the evidence adduced at defendant's trial does not support a finding that Freddie, for whose acts defendant was legally responsible, could have been guilty of aggravated assault rather than attempted murder. Green testified that he felt shots pass by his head and that he knew he was being fired at. The occurrence witnesses indicated that the shooter was aiming at Green from a shooting stance. No one testified that the shooting was done to scare Green, and the medical examiner found that Tamara was not shot by a ricochet bullet, indicating a direct hit. Defendant argues that Torrence's testimony that defendant stated that he did not know why his brother shot like a "maniac" was sufficient evidence to justify instructing the jury on aggravated assault. However, we find that that ambiguous statement does not amount to evidence that Freddie intended only to frighten Green; we accordingly hold that the trial judge did not err in refusing to instruct the jury on aggravated assault.

## V

Defendant next argues that the trial court's provision of a limiting instruction regarding Moore's and Green's inconsistent statements constituted reversible error. The court instructed the jury to consider their inconsistent statements only for impeachment purposes. Conceding that this issue was waived when defense counsel failed to object, offer an alternative instruction, or include the claimed error in his post-trial motion, defendant argues that the error is of such magnitude that we should invoke the plain error doctrine. We disagree. Plain error occurs when the defendant has been deprived of a fair trial because of the denial of a substantial right or when error occurs in a case with closely balanced evidence. (*Bean,* 137 Ill. 2d at 80, 560 N.E.2d at 275-76.) Defendant's case fits neither category of plain error.

At trial, Moore stated that both the passenger and the driver were armed. He then acknowledged having told a detective that only the passenger shot at Green. Green testified at trial that the driver reached behind his back, causing Green to fear that he had a gun and to flee. In former testimony, he had stated that it was the passenger who reached behind his back. Both statements at trial came within the statutory hearsay exception for prior inconsistent statements, and the jury should have been instructed that they could be considered for substantive purposes. See Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1.

Defendant contends that the inconsistent statements "involved the crucial issue of possession of a weapon." Since we have found that defendant's conviction based upon accountability was proper,

his possession of a weapon was not a crucial issue. (Compare *People v. Johnson* (1988), 173 Ill. App. 3d 998, 1004-05, 527 N.E.2d 1317, 1321, *appeal denied* (1989), 124 Ill. 2d 559, 535 N.E.2d 918 (the failure to instruct the jury that a witness' prior inconsistent statements were admissible as substantive evidence did not deprive the defendant of a fair trial when the prior statement's only value was to impeach the witness and it was admitted for that purpose), with *People v. Wilson* (1986), 149 Ill. App. 3d 1075, 1079, 501 N.E.2d 863, 865, *appeal denied* (1987), 114 Ill. 2d 556, 508 N.E.2d 735 (defense counsel's failure to request an instruction that a witness' prior inconsistent statement could be considered for substantive purposes amounted to ineffective assistance of counsel when the statement directly supported the defendant's lack of intent defense and would have been a basis for an instruction on a lesser charge).) Because this is not a case where the evidence was closely balanced, nor one in which defendant was deprived of a fair trial by the erroneous instruction, we are not persuaded to find plain error. See *Bean*, 137 Ill. 2d at 80, 560 N.E.2d at 275-76.[4]

## VI

Defendant next contends that he was denied a fair trial when the trial judge refused to give his tendered instruction on the lesser offense of involuntary manslaughter. Defendant misconstrues the law in this area.

A defendant in a murder case is entitled to an instruction on involuntary manslaughter if there is some, even slight, but credible evidence in the record to reduce the charge. (*E.g.*, *Maldonado*, 240 Ill. App. 3d at 480, 608 N.E.2d at 506.) The major distinction between the elements of murder and manslaughter is the requisite mental state. Murder requires the intent to kill or to do great bodily harm, or knowledge that one's acts create a strong probability of death or great bodily harm, while involuntary manslaughter requires only reckless conduct which causes death. (*People v. Austin* (1990), 207 Ill. App. 3d 896, 899, 566 N.E.2d 492, 493, *appeal denied* (1991), 137 Ill. 2d 666, 571 N.E.2d 150.) "A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that circumstances

---

[4]Defendant in his reply brief and at oral argument claimed ineffective assistance of counsel regarding this issue "as an alternative and in addition to plain error." He failed to provide support for his claim through argument and proper authority and we therefore do not address it on the merits. *People v. Felder* (1992), 224 Ill. App. 3d 744, 763, 586 N.E.2d 729, 741, *appeal denied* (1992), 144 Ill. 2d 638, 591 N.E.2d 26 (a mere cursory allegation of ineffective assistance of counsel cannot establish a constitutional violation).

exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." *Austin*, 207 Ill. App. 3d at 898-99, 566 N.E.2d at 493-94, citing Ill. Rev. Stat. 1985, ch. 38, par. 4—6.

Defendant maintains that evidence in the record, if believed by the jury, could support a conviction of the lesser offense. He notes that the jury could have believed that neither he nor Freddie had the intent to kill Green because: motive evidence could indicate only an intent to discuss differences; no shots hit Green; defendant described his brother as shooting like a "maniac"; the shooter "fanned" the gun; the gun was pointed only generally in Green's direction; Freddie did not pursue Green; and the shooting occurred in broad daylight in front of numerous witnesses. We agree with the trial judge that intentionally firing into a crowd cannot be reckless.[5]

Illinois courts consistently hold that when the defendant intends to fire a gun, points it in the general direction of her intended victim, and shoots, such conduct is not reckless, regardless of the defendant's assertion that she did not intend to kill anyone. (*Maldonado*, 240 Ill. App. 3d at 481, 608 N.E.2d at 507; accord *People v. DeMumbree* (1981), 98 Ill. App. 3d 22, 25, 424 N.E.2d 73, 75; *People v. Burnette* (1981), 97 Ill. App. 3d 1015, 1020, 423 N.E.2d 1193, 1198.) *People v. Hennon* (1992), 228 Ill. App. 3d 759, 593 N.E.2d 587, *appeal denied* (1992), 146 Ill. 2d 638, 602 N.E.2d 463, which involved accountability, is analogous to the case at bar. In that case, following an argument, the shooter stated that he wanted to "straighten out" some individuals and to "pop over at them and scare them." He then returned to the scene of the argument with the defendant and fired shots at a group of people, killing one and wounding another. We held that the shooter's conduct in intentionally firing shots at a group of individuals was not reckless, and therefore, the defendant, who was legally accountable for the shooter's conduct, was not entitled to an involuntary manslaughter instruction. *Hennon*, 228 Ill. App. 3d at 765-66, 593 N.E.2d at 591-92.

■ Like the *Hennon* defendant, defendant in the case at bar was not entitled to an involuntary manslaughter instruction when, on a spring afternoon, Freddie deliberately fired a gun in the direction of a group of people on a residential street with the tragic result that a

---

[5]The trial judge recalled giving an involuntary manslaughter instruction in Freddie's trial, because Freddie had testified that he intended only to scare Green when he fired at him. See *Jefferson*, 227 Ill. App. 3d at 494, 592 N.E.2d at 139.

13-year-old girl was killed. See *Maldonado*, 240 Ill. App. 3d at 482, 608 N.E.2d at 506 (the defendant did not act recklessly, and he was not entitled to an involuntary manslaughter instruction, when he fired into a car that he knew was occupied); *DeMumbree*, 98 Ill. App. 3d at 24-25, 424 N.E.2d at 74-75 (the defendant was not entitled to an involuntary manslaughter instruction when he fired a shotgun into a group of men outside a tavern during an argument); *Tiller*, 61 Ill. App. 3d at 794, 378 N.E.2d at 290 (the defendant, who fired shots into a group of police officers, was not entitled to an involuntary manslaughter instruction, even though he claimed that he intended only to scare them).

Defendant also argues that the trial judge erroneously refused to give his tendered involuntary manslaughter instruction regarding the death of Tamara. He points to *People v. Davis* (1974), 18 Ill. App. 3d 173, 309 N.E.2d 338, to support his contention. In that case, the defendant went to pick up a package for a friend, and when he arrived at the apartment where he was to get the package, he and the man who answered the door argued while a woman stood nearby in the doorway. The defendant testified that he fired his gun, believing that the man was armed and that the woman, whom he could no longer see, had left the doorway. He killed both of them. (*Davis*, 18 Ill. App. 3d at 174, 309 N.E.2d at 339.) The defendant argued that the trial court erred when it refused to give an involuntary manslaughter instruction regarding the shooting of the woman, contending that his actions toward her were reckless. The appellate court held that the intentional shooting of the man was not inconsistent with the reckless shooting of the woman or the reckless act of firing into the doorway and that the defendant was entitled to an instruction on the lesser charge, reflecting his theory of the case. *Davis*, 18 Ill. App. 3d at 175, 309 N.E.2d at 339-40.

Defendant in the case at bar argues that, like *Davis*, there was no direct evidence that either he or Freddie was aware of Tamara's presence and the evidence indicated that Freddie was not firing at her. However, as defendant concedes, *Davis* has been criticized for its failure to address the doctrine of transferred intent. In *People v. Harris* (1984), 123 Ill. App. 3d 899, 463 N.E.2d 1030, the defendant argued that he was entitled to an involuntary manslaughter instruction when he killed his wife and a neighbor. He argued that he intended to shoot only his wife and that his shooting of the neighbor was reckless. Declining to follow *Davis*, we held that "[w]hen a defendant shoots at one person, intending to kill him with no legal justification, but accidentally kills another person whom he did not intend to kill, he is still guilty of murdering that unintended

victim." (*Harris*, 123 Ill. App. 3d at 907, 463 N.E.2d at 1036.) In recognizing the doctrine of transferred intent, *Harris* is more consistent with Illinois law than is *Davis* and we therefore decline to follow *Davis*. See generally *People v. Marshall* (1947), 398 Ill. 256, 263, 75 N.E.2d 310, 313.

Consequently, we hold that defendant was not entitled to an involuntary manslaughter instruction and the trial judge properly refused to give one.

## VII

Defendant next contests his sentences. He urges us to order that his sentences for the crimes of which he was convicted in Illinois run concurrently, rather than consecutively, with his Arkansas sentence.

The imposition of a sentence and whether it is to run concurrently or consecutively is within the discretion of the trial judge. (*People v. O'Neal* (1988), 125 Ill. 2d 291, 297-98, 531 N.E.2d 366, 368; *People v. Harris* (1991), 220 Ill. App. 3d 31, 32, 580 N.E.2d 903, 904.) Our supreme court instructs us that "[t]he trial judge is ordinarily best situated to tailor a sentence or other disposition to the needs of the case." (*People v. Hicks* (1984), 101 Ill. 2d 366, 375, 462 N.E.2d 473, 477.) The trial judge has the advantage of hearing and observing, during trial and during the hearing in aggravation and mitigation, those factors necessary to his determinations. (*People v. Craig* (1977), 47 Ill. App. 3d 242, 253, 361 N.E.2d 736, 745.) While consecutive sentences should be imposed "sparingly" (*O'Neal*, 125 Ill. 2d at 298, 531 N.E.2d at 369), the exercise of the trial judge's discretion in sentencing will not be altered by a reviewing court unless there has been an abuse of that discretion (*Hicks*, 101 Ill. 2d at 375, 462 N.E.2d at 477).

At the hearing on mitigation and aggravation in the case at bar, Torrence testified that he and defendant took weapons to Arkansas, that he committed an armed robbery there at defendant's behest, and that he and defendant were both later convicted for their involvement in that crime. Defendant's mother, Mabee Coleman, testified in mitigation that defendant was a good example to his siblings, that he helped care for her husband when he was dying of cancer, and that he had acted like a father since her husband died.

The judge referred to the applicable statutory provision on consecutive terms requiring him to consider "the nature and circumstances of the offense and the history and character of the defendant" in determining if "such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." (Ill. Rev. Stat. 1989, ch. 38,

par. 1005—8—4(b).) The judge noted that defendant's involvement in the armed robbery occurred while he was released on bond for the shooting in this case. Although this factor was not contained in the statutory guidelines on aggravation, the judge noted that he was not required to "be blind" to such considerations. He concluded that consecutive terms were appropriate, stating: "I find that there is not one iota of compassion that you have or regret that you have for what has happened. *** [Y]our background indicates to me that you have got to be protected from the public [*sic*] ***."

The cases defendant relies on to support his contention that the trial judge abused his discretion are distinguishable from the instant case. For example, in *O'Neal*, the supreme court affirmed our order modifying the defendant's sentences for murder, rape, and aggravated kidnapping to run concurrently. In that case, the defendant was only 19, had a limited education, had overcome a drug problem, and his criminal record consisted of only one conviction for robbery for which he received probation (subsequently revoked). Additionally, he had tried to escape from his accomplice's oppressive control, and although he shot his accomplice, he did not harm their kidnapping victim. (*O'Neal*, 125 Ill. 2d at 300, 531 N.E.2d at 369-70.) And, in *People v. Gray* (1984), 121 Ill. App. 3d 867, 460 N.E.2d 354, we modified consecutive sentences when the defendant had no criminal record, was in his early twenties, and had "an excellent past record." *Gray*, 121 Ill. App. 3d at 872-73, 460 N.E.2d at 357-58.

■ In contrast, defendant in the present case was in his late thirties at the time of his trial, and his criminal record was extensive. His Illinois record included convictions for the unlawful use of weapons (1981 and 1984), possession of a controlled substance (1983), and possession of marijuana (1976). The judge considered proper statutory factors (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(b)), and he made an express finding that defendant represented a danger to the public. Given these facts and defendant's lack of remorse, we do not believe that the judge's order that defendant serve his Illinois sentences consecutively with his Arkansas sentence was unwarranted. See *Felder*, 224 Ill. App. 3d at 762, 586 N.E.2d at 741 (affirming consecutive sentences for attempted murder and murder when the trial judge "seriously considered all factors in mitigation and aggravation and determined, based on those factors and evidence presented at trial, that a consecutive sentence was mandated").

## VIII

Defendant next argues that the trial court's imposition of a 40-year sentence for murder, the maximum allowable at that time, was

fundamentally unfair since Freddie received the same sentence, and, as the shooter, Freddie was more culpable. Additionally, defendant claims that his criminal background is less extensive than Freddie's. We find this argument to be without merit.

As discussed above, sentencing determinations are within the trial judge's discretion and will not be modified absent an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 884.) Moreover, we have held that a defendant convicted on an accountability theory shares equal guilt with the principal perpetrator of the crime. *People v. Crutcher* (1979), 72 Ill. App. 3d 239, 248, 390 N.E.2d 571, 578.

In *Crutcher*, the defendant sat silently in his car while his codefendant robbed a gas station attendant at gunpoint. After he was convicted of armed robbery on an accountability theory, he was sentenced to 6 to 18 years in prison while his codefendant received a sentence of only four to eight years. The defendant argued that the disparity in sentences was unjustified because his codefendant was more culpable. We disagreed, noting that, unlike his codefendant, the defendant had a prior criminal record and that he was equally responsible for the armed robbery under accountability principles. *Crutcher*, 72 Ill. App. 3d at 242, 247-48, 390 N.E.2d at 574, 578; see also *People v. Fauntleroy* (1991), 224 Ill. App. 3d 140, 152-53, 586 N.E.2d 292, 299-300 (holding that the two defendants' identical sentences were proper even though only one of them killed their robbery victim); *Hennon*, 228 Ill. App. 3d at 768-69, 593 N.E.2d at 594 (holding that the defendant's sentence was justified even though he was convicted on an accountability theory and his codefendant received a lighter sentence after the trial court carefully considered all the circumstances of his case, including his lack of a criminal record and the testimony of witnesses that he had a peaceful nature).

■ While a less severe sentence may be justified if one defendant is less culpable or has greater rehabilitative potential than his accomplices, as evidenced by a less extensive criminal background and relative maturity (see *People v. Jackson* (1986), 145 Ill. App. 3d 626, 646, 495 N.E.2d 1207, 1222; *People v. Dimmick* (1980), 90 Ill. App. 3d 136, 139, 412 N.E.2d 1150, 1152-53), those factors are not present in the case at bar. Defendant's criminal background is not significantly less extensive than Freddie's,[6] and at the time of sentencing, he was 36, eight years older than Freddie and well be-

---

[6] Freddie had claimed that his criminal convictions included: purse snatching (1981); auto theft (1983); and aggravated battery (1987). However, his "B. of I." records indicate that he was convicted of: unlawful use of a

yond the age of a juvenile. See *Dimmick*, 90 Ill. App. 3d at 139, 412 N.E.2d at 1153 (explaining that "more mature criminals require more significant punishment in order to rehabilitate them, whereas juvenile offenders and those younger offenders subject to the criminal law can be treated more leniently").

In view of the trial judge's thoughtful consideration of mitigating and aggravating factors, and all the circumstances of this case, we find that defendant's argument that fundamental fairness requires modification of his sentence is warrantless.

## IX

Defendant next argues that the trial court imposed a $9,250 fine as part of his sentence without considering his ability to pay and that we should, therefore, vacate the fine. The State correctly argues that defendant waived this issue by failing to raise it at his sentencing hearing or in his motion to reduce sentence. See *People v. Bronson* (1991), 216 Ill. App. 3d 839, 842, 576 N.E.2d 449, 451.

■ Waiver notwithstanding, we find, after reviewing the record, that the trial judge was aware of defendant's ability to pay when he ordered the fine to be paid from his bond funds; we accordingly find no abuse of discretion in assessing the fine. See *People v. Powell* (1991), 224 Ill. App. 3d 127, 139, 586 N.E.2d 589, 599, *appeal denied* (1992), 144 Ill. 2d 640, 591 N.E.2d 29; *People v. Morrison* (1983), 111 Ill. App. 3d 997, 998, 444 N.E.2d 1144, 1145 (a determination that the defendant has the ability to pay need not be explicit when the trial judge is aware of facts in the record supporting such a determination).

## X

Finally, defendant argues that he is entitled to a $5-per-day credit against the amount of the fine for the 357 days he spent in prison, *i.e.*, from the time of his arrest on April 27, 1989, until the date that he was fined, April 19, 1990. (Ill. Rev. Stat. 1987, ch. 38, par. 110—14.) Our criminal code provides that "[a]ny person incarcerated on a bailable offense who does not supply bail and against whom a fine is levied on conviction of such offense shall be allowed a credit of $5 for each day so incarcerated upon application of the defendant." The clerk of the court is obligated to notify the defendant of this provision when the defendant is convicted. (Ill. Rev. Stat. 1987, ch. 38, par. 110—14.) A defendant is entitled to the credit even if she has already received jail-time credit against a sentence of

---

weapon (1986); attempted robbery and robbery (1982); and aggravated battery (1986).

imprisonment. (*People v. Hare* (1988), 119 Ill. 2d 441, 452, 519 N.E.2d 879, 883.) If the defendant is not notified by the clerk of her right to the credit, she has not waived application for the credit and may apply for it on appeal. *People v. Laster* (1990), 208 Ill. App. 3d 482, 483, 567 N.E.2d 433, 433.

In the present case, the State argues that defendant was not jailed on a bailable offense because he forfeited bond when he left Illinois without permission and violated the laws of Arkansas. The State notes that the trial judge entered an order of forfeiture. However, the judge acknowledged vacating that order on June 20, 1989. In defendant's motion to vacate the order, he explained that he missed a trial date because of his incarceration in Arkansas. Although the State argued at defendant's sentencing hearing that this constituted an admission by defendant that he had violated the conditions of his bond (see *People v. Brautigan* (1979), 79 Ill. App. 3d 595, 399 N.E.2d 183), the trial judge refused to alter his order vacating the forfeiture. That order, in effect, was a determination that defendant's absence was not for the purpose of obstructing justice or avoiding prosecution. (See Ill. Rev. Stat. 1987, ch. 38, par. 110—16.) Thus, the State's contention that defendant was not bailable is not convincing. In addition, nothing in the record indicates that defendant received the requisite notice from the clerk. Therefore, he qualifies under the statute for a $5-per-day credit for each day that he was incarcerated, a total of $1,785, to be credited against his $9,250 fine.

Based upon the foregoing, we affirm defendant's conviction and sentence and we find that he is entitled to a $5-per-day credit against his fine for the 357 days he spent imprisoned before his conviction.

Affirmed as modified.

DiVITO, P.J., and McCORMICK, J., concur.